PATRICIA A. WEBER *vs.* COMMUNITY TEAMWORK, INC., & others.[1]

Middlesex. April 5, 2001. - August 13, 2001.

Present: MARSHALL, C.J., GREANEY, SPINA, SOSMAN, & CORDY, JJ.

*Anti-Discrimination Law,* Termination of employment, Prima facie case, Burden of proof. *Employment,* Discrimination, Termination, Retaliation. *Contract,* Employment. *Unlawful Interference. Malice.*

In an action by the plaintiff alleging unlawful discrimination in her employer's failure to promote her, the judge correctly concluded that the plaintiff had established a prima facie case of discrimination, but had not met her burden of proving unlawful discrimination because there was evidence to support some of her employer's "legitimate, nondiscriminatory" reasons for choosing a male applicant over the plaintiff. [766-769]

In an action by the plaintiff alleging unlawful discrimination in her employer's termination of her employment, the judge correctly concluded that the plaintiff had established a prima facie case of discrimination; however, the record did not support the judge's conclusions that the defendants' proffered reasons for terminating the plaintiff were "wholly lacking" in evidentiary support and in credibility; moreover, while the judge made the requisite findings that the plaintiff was a member of a protected class and was harmed by the termination, she did not determine whether the defendants harbored any discriminatory animus and, if so, whether that animus was the determinative cause in bringing about the plaintiff's termination, and consequently, this court remanded the case so that the judge could make findings and reach conclusions on those two essential elements. [769-778]

In an action by the plaintiff alleging breach of contract in her employer's termination of her employment, the judge erred in concluding that a progressive discipline policy, implemented during the tenure of the plaintiff's predecessor, constituted an implied employment contract between the plaintiff and her employer that the employer breached, where the policy was not binding on the employer because it was not submitted to or approved by its board; where, by its own terms, the policy did not apply to disciplinary action taken by the employer's executive director against a department head such as the plaintiff; and where the plaintiff failed to establish that she relied on the terms of the policy as a condition of her continuing employment. [778-781]

This court vacated a ruling by a Superior Court judge that a nonprofit

[1]Thomas H. Conway, Jr., and James L. Canavan, Jr.

corporation's executive director had unlawfully interfered with the plaintiff employee's advantageous relations with her employer, and the plaintiff's claim was remanded for further findings with regard to the requirement that the plaintiff show, as to "improper motive or means," that the "controlling factor" in the alleged interference was "actual" malice. [781-783]

In an action arising out of the plaintiff's termination from her employment, the judge erred in allowing the plaintiff to amend her complaint to state a claim for retaliatory discrimination under G. L. c. 151B, § 4 (4), raised for the first time after the close of the evidence, where, since the plaintiff asserted her claim for retaliatory discrimination nearly four years after the last allegedly retaliatory act was committed, the retaliation claim was barred by the three-year statute of limitations provided by G. L. c. 151B, § 9, and where, since her claim did not "arise out of the conduct, transaction, or occurrence" she alleged in her earlier pleadings, Mass. R. Civ. P. 15 (c), it did not relate back to her earlier pleadings. [783-786]

CIVIL ACTION commenced in the Superior Court Department on December 10, 1993.

The case was heard by *Sandra L. Hamlin*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Cheryl M. Cronin* (*Douglas Phillips* with her) for the defendants.

*Frederick T. Golder* (*Elisabeth M. LeBrun* & *Jeffrey R. Mazer* with him) for the plaintiff.

The following submitted briefs for amici curiae:

*Sally L. Adams, Daryl J. Lapp,* & *Steven L. Schreckinger* for Association of Independent Colleges and Universities in Massachusetts.

*Robert S. Mantell, Jonathan J. Margolis,* & *James E. Fitzgerald* for Massachusetts Employment Lawyers Association.

MARSHALL, C.J. In early 1992, Patricia Weber, a longtime employee of Community Teamwork, Inc. (CTI),[2] applied for, but was not promoted to, the position of CTI's executive director. Some months later she was terminated by CTI's new executive director, James L. Canavan, Jr. She brought suit against CTI, Canavan, and Thomas H. Conway, Jr., a member

---

[2]CTI is a nonprofit corporation whose purpose is to assist indigent persons to become self-sufficient. A substantial portion of CTI's work involves the administration of housing rental subsidy programs with funds received from the Executive Office of Communities and Development (EOCD).

of CTI's board of directors, alleging discrimination on the basis of sex and sexual orientation, breach of contract, unlawful interference with contractual relations, retaliatory discrimination, wrongful termination in violation of public policy, and a violation of the Massachusetts equal rights statute, G. L. c. 93, § 102.

After a jury-waived trial, a judge in the Superior Court rejected Weber's claims that CTI's failure to promote her was discriminatory or that her termination from CTI was a violation of any public policy. The judge ruled, however, that Weber's termination constituted discrimination,[3] breach of contract, unlawful interference with contractual relations,[4] and retaliatory discrimination. She awarded Weber back pay damages and benefits in the amount of $133,704, fifteen years of front pay damages in the amount of $546,480, and emotional distress damages of $100,000. The judge also awarded Weber her attorney's fees in an unspecified amount. The parties filed cross appeals, and we transferred the case to this court on our own motion. We affirm the judge's rulings that CTI's failure to promote Weber was lawful. We vacate the remaining aspects of the judgment challenged by the defendants,[5] and remand the case to the Superior Court for additional findings and conclusions by the judge on Weber's claims of discrimination and unlawful interference with contractual relations.

I

We summarize the procedural history because it is relevant to some of the issues on appeal. Weber first filed her charges with the Massachusetts Commission Against Discrimination (MCAD), alleging that all three defendants had discriminated against her on the basis of her sex by failing to promote her to the position of executive director of CTI in October, 1992, and by terminating her without warning in March, 1993. See G. L.

---

[3]The judge did not specify whether the discrimination was on the basis of sex or sexual orientation.

[4]The judge concluded that only Canavan had unlawfully interfered with Weber's advantageous relations with CTI.

[5]Weber has not challenged the judge's entry of judgment against her on her public policy claim, or on her claim under G. L. c. 93, § 102, and those aspects of the judgment are not vacated.

c. 151B, § 5.[6] Weber, who is a lesbian, subsequently amended her charges to include claims of discrimination on the basis of sexual orientation. Before the MCAD acted on her charges, she brought suit in Superior Court pursuant to G. L. c. 151B, §§ 4, 9,[7] adding claims for breach of contract, intentional interference with contractual relations, and a violation of the Massachusetts equal rights statute, G. L. c. 93, § 102.[8]

The trial commenced in February, 1997. At the close of Weber's evidence the judge allowed the defendants' motion to dismiss Weber's equal rights claim, G. L. c. 93, § 102, but denied their motion in all other respects. She later denied their motion for a directed verdict. On the final day of trial, and immediately prior to closing arguments, Weber moved to amend her complaint to add claims that her termination violated public policy[9] and constituted retaliatory discrimination in violation of G. L. c. 151B, § 4 (4). Over the defendants' objection, the judge allowed her motion. The judge subsequently entered findings of fact and conclusions of law, which we shall summarize in greater detail below.

---

[6]General Laws c. 151B, § 5, provides in pertinent part that any person claiming to be aggrieved by an alleged unlawful practice under G. L. c. 151B may "file with the commission a verified complaint in writing which shall state the name and address of the person, employer, labor organization or employment agency alleged to have committed the unlawful practice complained of . . . which shall set forth the particulars thereof and contain such other information as may be required by the commission."

[7]General Laws c. 151B, § 4 (1), provides that it "shall be an unlawful practice . . . [f]or an employer . . . because of the sex [or] sexual orientation [of an individual] . . . to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification."

General Laws c. 151B, § 9, provides in part that any "person claiming to be aggrieved by a practice made unlawful under [G. L. c. 151B, § 4,] . . . may, at the expiration of ninety days after the filing of a complaint with the commission, or sooner if a commissioner assents in writing, but not later than three years after the alleged unlawful practice occurred, bring a civil action for damages or injunctive relief or both in the superior . . . court for the county in which the alleged unlawful practice occurred."

[8]Weber alleged discrimination and breach of contract claims against all three defendants, and unlawful interference and G. L. c. 93, § 102, claims against defendants Canavan and Conway only.

[9]Weber alleged for the first time that CTI had breached its implied covenant of good faith and fair dealing by terminating her for "whistleblowing."

On appeal Weber claims that it was error for the judge to conclude that CTI's failure to promote her to the position of CTI's executive director did not constitute unlawful discrimination in violation of G. L. c. 151B, and to deny her punitive damages on her retaliation claim. The defendants challenge the judge's rulings that (1) Weber's termination from CTI constituted unlawful employment discrimination; (2) they breached Weber's employment contract with CTI; and (3) Canavan had unlawfully interfered with Weber's advantageous relationship with CTI. See note 4, *supra.* They also challenge the judge's ruling permitting Weber to amend her complaint to add a claim for retaliatory discrimination, and her subsequent ruling that the defendants had in fact engaged in retaliatory discrimination. As to damages, the defendants challenge the award to Weber of fifteen years of front pay under G. L. c. 151B, and argue that any damages awarded for violations of that statute by the defendants should, in any event, be capped at $20,000 pursuant to G. L. c. 231, § 85K. Finally, they challenge the award to Weber of attorney's fees for so much of her G. L. c. 151B claim on which she did not prevail.[10]

II

Before turning to consider the respective arguments, we summarize the chronology of Weber's career at CTI because it provides helpful context to her claims. Weber was hired by CTI in 1975 as an assistant director of family day care. In the succeeding twelve years, Weber assumed steadily increasing program development and supervisory responsibilities, serving from 1976 to 1978 as an assistant director of the family life services department, and from 1978 to 1987 as that department's director.[11] In 1987, she was named associate director of programs, in which capacity she reported directly to CTI's longtime executive director, Leo Desjarlais, and became the direct supervisor of CTI's eight department directors, including

[10]The defendants argue that, even if Weber prevails on her G. L. c. 151B claims stemming from her termination, she is not entitled to attorney's fees for her promotion claim, on which she did not prevail.

[11]In her work in the family life services department, Weber supervised day care providers, wrote grant proposals, created and operated new day care programs, and evaluated staff.

the director of its housing and community development department. Sometime thereafter, Weber discovered that Desjarlais was mishandling CTI's funds. She triggered an investigation by the office of the Auditor of the Commonwealth, which ultimately led to Desjarlais's discharge from CTI in 1991.[12] In late 1991, following Desjarlais's discharge, the board appointed the defendant Conway, then the president of CTI's board of directors, as CTI's acting executive director. Fearing that her position as associate director of programs was in jeopardy with the impending appointment of a new executive director,[13] and although she herself became a candidate for that position, Weber asked Conway to appoint her as the director of CTI's housing and community development department. Weber had not previously worked in the housing department, but Conway agreed, and in February, 1992, Weber assumed that position. Shortly thereafter, she applied for the position of executive director, but an outside candidate, Canavan, was the successful applicant.

## III

We first address Weber's argument that the judge erred by ruling that CTI's failure to promote her to the position of executive director did not constitute unlawful discrimination. We recount the judge's findings relevant to this claim.

From 1987 to 1992, in her tenure as associate director of CTI, Weber served "in all but title" as CTI's executive director.[14] The judge found that Weber was a "hardworking, responsible, talented, caring and dedicated employee with excellent administrative ability," who consistently received "excellent" performance reviews.

---

[12]The investigation initiated by Weber and undertaken by the office of the Auditor of the Commonwealth also led to Desjarlais's conviction in Federal court. The record does not disclose the nature of those convictions. Weber was not involved in any of Desjarlais's wrongdoings.

[13]There is no evidence to explain why Weber had any such apprehension. Weber testified that she knew that she would be a "prime target" of a new executive director, but did not elaborate on her fears.

[14]Weber testified that before her promotion to the position of associate director, Desjarlais, then the executive director of CTI, promised her that, in exchange for Weber doing "all of the work" of the executive director during his tenure, he would promote her to that position when he retired.

When it became necessary to replace Desjarlais, the board advertised the position and ultimately hired Canavan, who served at the time as the director of development and planning at an agency similar to CTI. Canavan previously had worked from 1987 to 1990 as an assistant energy planner, an assistant director of the housing services program, and finally as the acting director of the office of community and economic development within the Executive Office of Communities and Development (EOCD). EOCD provides housing subsidies to low-income persons and ensures that subsidized housing units comply with Federal and State regulations. It had contracted with CTI's department of housing and community development to run various low-income housing programs. EOCD was in fact one of CTI's primary sources of funding.

There was extensive testimony that, in the wake of Desjarlais's mismanagement, CTI was in a financial crisis, its staff lacked morale and strong leadership, and it had lost credibility with EOCD.[15] There was unrebutted testimony that CTI's board believed that new leadership by an outsider, but one who "had the experience and the knowledge of . . . what [CTI's] kind of agency was about," was essential to meeting CTI's goals of improving its fractured relationship with EOCD and remedying its fiscal crisis.[16] CTI explained at trial that these were the reasons it appointed Canavan as CTI's new executive director.

The judge found that, based on her resume, background, and work experience, Weber was "eminently more qualified" than Canavan to assume the position of CTI's executive director. She also found that, before Canavan was hired, a "sexist attitude prevailed at CTI"[17] and that it was "common knowledge" throughout the organization that Weber is a lesbian.

---

[15]There was uncontested evidence that CTI's credibility with EOCD had been badly damaged by Desjarlais's misappropriation of funds and by CTI's inadequate oversight of housing programs that CTI had contracted with EOCD to run. Weber, who as associate director had direct supervision over the housing department from 1987 to 1992, testified that around that time CTI was "under the gun from EOCD."

[16]Canavan testified that, while he was employed by EOCD, he became familiar with CTI because the housing services program that he supervised and for which EOCD provided funds was being operated by CTI.

[17]The judge found that "[w]omen were not respected and their opinions were considered less valuable than the men's." Desjarlais and defendant Con-

The judge then applied the analytical framework of *Blare* v. *Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 440-446 (1995). She concluded that Weber had established a prima facie case of discrimination, but had not met her burden of proving unlawful discrimination because there was evidence to support some of CTI's "legitimate, nondiscriminatory" reasons for choosing Canavan over Weber. Weber now argues that, because the judge found that she was "eminently more qualified" than Canavan and that a "sexist attitude prevailed" at CTI, the judge should have concluded that the defendants' asserted reason for hiring Canavan was a pretext. See *id.* at 444-446.

The judge's ruling was correct. Weber's contention rests on the flawed supposition that the findings on which she relies precluded a finding that CTI's asserted reasons for hiring Canavan were in fact its reasons for hiring him. There was sufficient evidence that Canavan's "outsider" status and his prior work experience and previous dealings with EOCD were sound reasons for CTI to prefer him over a well qualified internal candidate, even one "eminently more qualified." While it would have been preferable for the judge to make explicit what is implied by her findings, namely, that Weber and Canavan were both qualified for the position of executive director but were qualified in different ways, she did not err in concluding that Weber did not meet her burden of proving that the defendants' failure to promote her constituted unlawful discrimination.

Even if Weber had succeeded in persuading the judge that CTI's asserted explanation for hiring Canavan was not the reason it actually hired him, a point not argued by the defendants, the judge would have been permitted to conclude that the failure to promote Weber did not amount to unlawful discrimination. See *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. 107, 118 (2000) (fact that employer's asserted reason is pretext permits, but does not require, an inference that there was unlawful discrimination). The judge would have been entitled to weigh evidence indicating that the

way told sexist jokes about women, creating "an inappropriate atmosphere and environment for women." Conway on one occasion told Weber that another female employee was an "airhead" and a "dizzy woman."

defendants had no discriminatory motive in hiring Canavan, or that they had some other lawful explanation for choosing Canavan over Weber that had been advanced and was supported by the evidence. See *id*.

## IV

We turn next to the question of the judge's ruling that Weber's termination from CTI, in contrast to CTI's failure to promote her to the position of executive director, did constitute unlawful employment discrimination. We summarize the judge's findings on this aspect of the case, supplementing them where appropriate with uncontested facts in evidence.

By early 1992, when Weber was appointed the director of CTI's housing department, that department faced pervasive problems. For many years previously, Desjarlais had diverted funds from the department. There was also a perception that Desjarlais had hired individuals in that department based on favoritism rather than competence. By the time Desjarlais's employment was terminated, the department had an operating deficit of approximately $150,000, and the housing staff were beset by poor morale.[18] In short, the department was in crisis. Because subsidies provided by CTI to low-income tenants were funded by EOCD, CTI was subject to EOCD's regulatory oversight, and there was evidence that EOCD had serious concerns about the management of CTI's housing programs. CTI's housing department suffered from a poor "lease-up rate."[19] Worse, CTI was subsidizing many housing units of marginal quality, and its "maintenance failure" rate was high.[20] CTI's own inspections confirmed the department's poor record.[21]

The judge found that, in her first year as director, Weber's

---

[18]The fiscal crisis affected other CTI departments as well. The judge found that, in late 1992, CTI's total operating deficit was $645,000.

[19]The "lease-up" rate represents the number of units that CTI actually subsidized for low-income families divided by the number of units for which CTI had subsidy funds available. When Weber became housing director, the lease-up rate was approximately 85%; CTI's goal was to have a 100% lease-up rate.

[20]The "maintenance failure" rate refers to the percentage of CTI-subsidized units that failed random inspections.

[21]The "staff failure" rate represents the percentage of housing inspections

"hard work" and "good management" made a difference. But see note 15, *supra.* Within eleven months, the department's operating deficit decreased from \$150,500 to \$115,534[22]; within three months, the "lease-up" rate of low-income housing units subsidized by CTI rose to 99%. The "staff failure" rate was also reduced under Weber's "hands-on management" and her improvements in the housing inspection process.

Despite these improvements, it was undisputed that EOCD remained deeply concerned about CTI's housing program. According to Canavan, CTI's new executive director, in early January, 1993, EOCD officials "were breathing down our necks" to take swift action to improve the inspections of, and conditions in, certain low-income housing developments subsidized by CTI. On February 2, 1993, Weber, Canavan, and a third CTI employee met with three senior officials at EOCD. The EOCD officials expressed their serious concerns about the continuing inadequacy of CTI's housing inspections, the poor maintenance of housing units subsidized by CTI, and the "overall history of mismanagement." There was uncontroverted evidence that at this meeting the deputy secretary of EOCD threatened to terminate all of CTI's substantial housing funding if it did not take aggressive steps by June, 1993, to correct the problems in the housing department. There was also unrebutted testimony that, during the February, 1993, meeting, a senior EOCD official instructed CTI to "fire" Darryl Courtnay, Weber's deputy in the housing department. A senior EOCD official had also told Weber that she was "upset" with her.[23]

The threatened loss of EOCD's housing subsidies was serious; the EOCD subsidies comprised one-third of CTI's budget. There was uncontradicted evidence that CTI's housing depart-

---

by CTI inspectors that are improperly performed. That rate was also high.

[22]The judge also found that by April, 1993, just two months later, the department's deficit had again risen to \$157,000. The judge found that the deficit "was in no way attributable to Weber," but she made no finding that explained the substantial rise in the department's deficit from February, 1993, to early April, 1993, when Weber's employment was terminated.

[23]In a subsequent letter to EOCD dated March 1, 1993, Canavan explained that "while an excellent manager, [Weber's] strengths were in the area of human services, most notably in day care." She did not have any experience in housing subsidies, he explained, but "has worked hard to learn the complexities of housing subsidy programs."

ment depended entirely on EOCD for its funding. The loss of such significant funds would also have necessitated a number of lay-offs of CTI employees. While Weber had made improvements in the department, Canavan was left with the impression from that critical meeting that, to "save" the housing program, Darryl Courtnay and Weber "had to go." On March 16, 1993, one week after Weber and Canavan last met to discuss progress in CTI's housing department, Canavan called Weber to his office, and in the presence of several CTI board members, offered her the option of resigning or being terminated.[24] Weber was given no explanation for this action. Weber chose to be terminated. That same day Canavan offered the same choice to Darryl Courtnay. Courtnay resigned. Several weeks later Canavan appointed another woman to fill the position vacated by Weber.

Explaining her decision that Weber's termination constituted unlawful discrimination, the judge pointed to the fact that, in the wake of the critical EOCD meeting in February, 1993, Canavan did not give Weber any "specific directions" about steps she should take to remedy the problems cited by EOCD. The judge also found that, in spite of Weber's persistent efforts to hire more inspectors, Canavan "refused to move" on improving the staff failure rate, "consistently stalled on responding to her recommendations," and "stymied her efforts to rectify the situation." The judge found that Canavan had not told Weber that he was dissatisfied with her performance, nor had he indicated to her that her job was in jeopardy.[25] Shortly after she was terminated, Weber received a letter from Canavan confirming her termination, effective immediately, but again providing no explanation for his action. Weber later filed an application for unemployment benefits, and learned that CTI had reported that she had been terminated because of an "inability to do [her] job."[26]

Based on the judge's findings, we are persuaded that Weber

[24]The decision to sever Weber's employment was Canavan's decision alone. See note 34, *infra.*

[25]The judge found that, two weeks before her discharge, Weber had asked Canavan about her performance and he responded that "he had learned to trust and respect her work."

[26]In Part V, *infra*, we discuss the extent to which Weber's termination was in accordance with CTI's disciplinary procedures.

was treated shabbily, even unfairly, by CTI. The legal question we must resolve, however, is whether the evidence supports the judge's conclusion that Weber was discriminated against on the basis of her sex or sexual orientation.

On Weber's termination claim, the judge once again applied the analytical framework of *Blare* v. *Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 440-446 (1995). She first concluded that Weber had established a prima facie case of discrimination. That ruling is correct. Weber is a member of two protected classes (element one of the first stage of the *Blare* analysis), and the judge was not clearly in error in finding that Weber performed her job at an acceptable level (element two).[27] Weber was terminated from her position at CTI (element three), and a preponderance of the evidence supports the judge's finding that the woman hired to replace Weber as housing director was less qualified than Weber to run the department (element four).[28] See generally *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. 107, 116 (2000), citing *Blare* v. *Husky Injection Molding Sys. Boston, Inc.*, *supra* at 441.

Turning to the second stage of the *Blare* analysis, the judge said that the only evidence to support the defendants' claim that Weber was unable to do her job consisted of Canavan's testimony, and she discounted that testimony entirely. Canavan, she said, was "vague" and "evasive" as to "specific problems" he had with Weber. The judge found that the proffered reasons for the termination were "wholly lacking in credibility and evidentiary support," and that Weber was entitled to judgment on

[27]While the defendants insisted that Weber had not performed as housing director at an acceptable level, testimony concerning her reputation as an excellent manager and dedicated employee, combined with evidence that by March, 1993, she had worked hard to tackle the numerous problems inherited when she became the housing department director, precludes any holding that the judge committed clear error in finding that Weber was performing her job at an acceptable level. That does not, of course, obviate a later (stage two) consideration of CTI's own explanation of its evaluation of the employee's performance, and to what extent its evaluation informed its decision to terminate Weber. See *Lipchitz* v. *Raytheon Co.*, *ante* 493, 501, 507 (2001).

[28]It was not necessary for Weber to prove that her replacement was less qualified, only that she was replaced by someone with qualifications no greater than Weber's. See *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. 107, 116 (2000).

her discrimination claim. See *Blare* v. *Husky Injection Molding
Sys. Boston, Inc.*, *supra* at 442 (where employer fails to produce
"credible evidence" to show that the reason or reasons advanced
for the termination "were the real reasons," plaintiff is
"entitle[d]" to judgment). We are not persuaded that the judge
was correct, for two reasons.

First, the record does not support the judge's conclusion that
the defendants' proffered reasons for terminating Weber were
"wholly lacking" in evidentiary support. Canavan was clear that
he terminated Weber because she displayed an "absolute lack of
progress in addressing the problems in the housing department,"
and that action was required to "save" the housing department.
He supported his explanation with specific examples, including
that Weber did not comprehend the urgency of the department's
problems.[29] More importantly, there was other evidence support-
ing Canavan's testimony that it was essential that CTI take drastic
action to remedy the problems in the housing department, or risk
losing all of its EOCD funding.[30]

A CTI program director testified that, before Canavan
terminated Weber, he told her (the program director) that We-
ber's "performance was not what it should have been," that the
housing department was "not turning around," and that EOCD
was "unhappy with things" and "wanted to see heads roll."[31]
Weber's own testimony corroborated what Canavan had said to

[29]There was unrebutted testimony that immediately following the fateful
EOCD meeting in February, 1993, Weber went on vacation. Canavan testified
that, on returning from her February vacation, Weber promptly submitted a
request to take another vacation in May, 1993, just one month before the
EOCD-imposed June deadline. Canavan testified that Weber did not hire hous-
ing inspectors in a timely manner; did not open the housing waiting list to
improve the lease-up rate; did not reduce the department deficit in a timely
manner; and did not make improvements in the department's marginal hous-
ing properties in a timely fashion.

[30]A member of CTI's board testified that EOCD continued to place pressure
on CTI after the meeting, that "things weren't changing to suit" EOCD, that
"it was clearly a problem in housing," and that Weber was not able "to deal
with the problem." Before Weber's termination, Canavan informed a board
member that Weber was not implementing his instructions and was not, in his
judgment, taking the department's problems and EOCD's concerns seriously.

[31]Another program manager testified that Canavan told her that he had "no
confidence" in Weber's abilities and that he terminated Weber because "she
was not doing her job."

others. The February meeting with EOCD, she said, "was one of the worst" of her career. She admitted that she had been criticized about her performance as housing director, and that Canavan "knew enough to know in March of 1993 that the housing department was in big trouble." Canavan's failure to confront Weber directly with his concerns about her performance may have been exceedingly poor management practice. But there was sufficient evidence that his explanation for the termination was not manufactured after he made the decision to terminate her.

There was also uncontradicted evidence that Weber could be held responsible, in part, for the downward spiral in the housing department even before she assumed its directorship in 1992. Weber testified that, in her capacity as associate director of programs, a role she assumed in 1987, she supervised all eight of CTI's departments, including the housing department. As executive director of CTI "in all but title," as the judge found, Weber was charged with supervising the department's field and service operations, and for recommending personnel changes. Testimony suggested that the problems in the housing department escalated while Weber, as associate director, had oversight of the department. There is little doubt that there was gross mismanagement of the housing department by Desjarlais. For EOCD (and Canavan) to have concerns about whether his "right-hand person," Weber, could turn the department around after Desjarlais was discharged was not unreasonable, even though it is clear that Weber had never participated in any of Desjarlais's criminal activities.

Second, the judge found that Canavan's proffered reasons for terminating Weber were "wholly lacking" in credibility. We defer, of course, to the judge's findings on credibility. See *Blare* v. *Husky Injection Molding Sys. Boston, Inc.*, *supra* at 445; *Packaging Indus. Group, Inc.* v. *Cheney*, 380 Mass. 609, 616 (1980). But her credibility ruling appears to be based on her erroneous conclusion that there was *no* "evidentiary support" for CTI's proffered reasons for terminating Weber. At the second stage of the *Blare* analysis, a defendant's burden to advance a lawful reason for an adverse employment action "is not onerous." *Blare* v. *Husky Injection Molding Sys. Boston, Inc.*,

*supra* at 442. The testimony by Weber and other witnesses, aside from Canavan, was adequate to support Canavan's assertion that he terminated Weber because 'urgent changes needed to be made in the housing department, and he had lost confidence in her ability. Contrary to the judge's conclusion, under the *Blare* analysis a stage three inquiry was therefore required.

While the judge *did* conclude that Weber had prevailed at stage two of the *Blare* analysis, she nevertheless conducted a *Blare* stage three analysis, apparently in an abundance of caution. Even if there *were* credible evidence to support Canavan's asserted reasons for the discharge, she explained, Weber would nevertheless prevail because she had succeeded in proving that the reasons for the termination were "simply a pretext." She pointed to evidence of a sexist atmosphere at CTI, and to the fact that the woman who succeeded Weber "did not make any better strides in improving the [h]ousing [d]epartment than Weber had when she was there." She also noted that Weber's "past work history while at CTI reveals only a dedicated, bright, and hardworking employee."

In reaching her decision, the judge did not make all of the findings that are required under G. L. c. 151B, § 4 (1). On a claim of unlawful discrimination, a plaintiff must prove at trial that she is a member of a protected class, she suffered harm as a result of an employer's adverse employment action, and the employer harbored discriminatory animus, which was the determinative cause of the adverse action. See *Lipchitz* v. *Raytheon Co., ante* 493, 502, 504 (2001). While the judge made the requisite findings that Weber is a member of a protected class and was harmed by the termination, she did not determine whether the defendants harbored any discriminatory animus, and if so, whether that animus was the determinative cause in bringing about Weber's termination.[32] Although a finding of "pretext" permits an inference that could satisfy Weber's

---

[32]The judge's third stage analysis in its entirety is as follows: "[Weber] has persuaded me by a preponderance of the evidence that defendants' asserted reason for her termination was not the real reason. Significantly, a sexist attitude prevailed at CTI. Consistent with that attitude, CTI failed to include women in the initial list of candidates for the executive directorship. Of the second group of interviewees, Weber was the only female. After CTI terminated Weber, they put in her place a woman who, although qualified, was

ultimate burden to prove that discriminatory animus was the determinative cause of her termination, the judge must indicate that she has drawn that inference. See *id.; Abramian* v. *President & Fellows of Harvard College, supra* at 118. Here the judge treated her finding of "pretext" as synonymous with a finding of discriminatory animus and causation, rather than as evidence that permits, but does not compel, a finding of those two "essential" elements. *Lipchitz* v. *Raytheon Co., supra* at 502-503. We do not fault the judge. She did not have the benefit of *Lipchitz* v. *Raytheon Co., supra,* and *Abramian* v. *President & Fellows of Harvard College, supra,* the two recent decisions in which we clarified that a plaintiff bears the burden to prove both discriminatory animus and causation at trial in a discrimination case.[33] We therefore remand the case to the Superior Court so that the judge may make findings and reach conclusions on those two essential elements.

In light of the judge's ruling on pretext, we add these observations. First, in her findings and conclusions the judge did not distinguish among the three defendants, CTI and the two individuals, Canavan and Conway. With respect to her stage two analysis on Weber's termination claim, the judge concluded that the "defendants' proffered reasons" were

---

referred to by Conway as a 'dizzy airhead.' Her successor did not make any better strides in improving the Housing Department than Weber had when she was there. Weber's past work history while at CTI reveals only a dedicated, bright, and hardworking employee. Nothing whatsoever in the evidence supports defendants' contention that Weber's inability to perform led to her termination. Accordingly, I find that Weber has successfully established that CTI's reason for firing her is simply a pretext."

[33]In *Abramian* v. *President & Fellows of Harvard College, supra,* we explained that a "showing that the employer's reasons are untrue gives rise . . . to an inference that the plaintiff was a victim of unlawful discrimination," and that "[t]hat inference, together with the elements described in stage one [of the *Blare* analysis,] provide sufficient basis for the [fact finder] to return a verdict for the plaintiff." See *Abramian* v. *President & Fellows of Harvard College, supra* at 118, citing *Blare* v. *Husky Injection Molding Sys. Boston, Inc.,* 419 Mass. 437, 446 (1995). In *Lipchitz,* we further clarified that an essential element of a claim under G. L. c. 151B is discriminatory animus and that "[p]ermitting the fact finder to infer discriminatory animus from proof that the employer has advanced a false reason [i.e., pretext] does not . . . eliminate the plaintiff's burden to prove" discriminatory animus. *Lipchitz* v. *Raytheon Co., supra* at 502, citing *School Comm. of Boston* v. *Labor Relations Comm'n,* 40 Mass. App. Ct. 327, 334 (1996).

"wholly lacking in credibility and evidentiary support," and that Weber had therefore prevailed at that stage. With respect to her stage three analysis, the judge concluded only that "Weber has successfully established that CTI's reason for firing her is simply a pretext." She articulated no comparable conclusion as to the two individual defendants. She then entered judgment on Weber's discrimination count "in favor of the Plaintiff," without reference to any particular defendant. As Weber sought damages against each of the defendants and presumably, if successful on her discrimination claim, could seek to enforce any judgment against any one of them, the judge should take care to explain the basis of any findings and conclusions of discriminatory animus and causation against each of the three defendants, separately.

Second, in reaching her decision on pretext on Weber's termination claim, the judge relied on evidence that Weber was the only woman interviewed for the position of executive director and that a sexist attitude prevailed at CTI. See note 32, *supra.* The evidence was uncontroverted that Canavan alone made the decision to terminate Weber.[34] The judge pointed to no evidence that Conway contributed to or participated in Canavan's decision to terminate Weber (or Darryl Courtnay); had such evidence been introduced, the evidence of Conway's earlier sexist behavior might have relevance. Canavan's decision to terminate Weber cannot be challenged because of events or conditions that predated his arrival at CTI, where there is no evidence that the earlier events informed his judgment. There is no evidence that Canavan fostered a sexist atmosphere at CTI, or that his decision to terminate Weber was influenced by the "sexist attitude" that prevailed at CTI before he became its executive director.[35] The judge must exercise care to distinguish between evidence relevant to CTI's refusal to promote Weber

---

[34]There was unrebutted evidence that Canavan was solely responsible for the decision to discharge Weber and her deputy, Darryl Courtnay. Canavan testified that, when he informed the president of the board that he intended to terminate Weber, the president told him, "This is your decision."

[35]Two witnesses did testify that they perceived no improvement in the sexist atmosphere at CTI in the months after Canavan's arrival. However, neither they nor any other witness said that Canavan had engaged in any sexist conduct, or that he was aware of it on the part of others.

and evidence relevant to her termination claim, as it applies to each defendant.

Finally, a determination that Weber was the subject of unlawful discrimination under G. L. c. 151B, § 4 (1), may not be based solely on evidence that Weber was treated unfairly by any defendant. Canavan discharged Weber without warning or explanation. In light of Weber's long and productive career at CTI, the abundant problems she inherited when she assumed the leadership of the housing department, and the improvements she had made in that department between March, 1992, and March, 1993, the decision to discharge her in such a summary fashion and without providing her any opportunity to meet the demands of a new executive director may have been grossly unfair. Such circumstances may give rise to a wrongful termination claim. See Part V, *infra*. But not every unfair termination — however "callous," as the judge described it — constitutes unlawful employment discrimination in violation of G. L. c. 151B. Membership in a protected class without more is insufficient to make the difference. See *Lipchitz* v. *Raytheon Co.*, *supra* at 502. Here, there was evidence that a man (Darryl Courtnay), Weber's second in command in the housing department, was terminated on the same day, apparently in the same abrupt manner, and apparently for the same reasons. If, on remand, the judge concludes that there was improper discriminatory animus by any defendant that was the determinative cause of Weber's termination, it would be helpful if she explained how the terminations of Weber and Courtnay can be distinguished.

## V

We turn now to Weber's breach of contract claim. The judge ruled that a progressive discipline policy implemented during Desjarlais's tenure, but never adopted by CTI's board, constituted an implied employment contract between CTI and Weber that CTI breached. The judge's decision was erroneous.

We summarize the facts on which the judge relied. In 1988 or 1989, Desjarlais asked Weber, then CTI's associate director of programs, to draft a discipline policy for CTI personnel. As drafted by Weber, the policy provided in part that, absent one of the enumerated circumstances warranting immediate termina-

tion, an employee was entitled to a series of escalating disciplinary measures before being discharged.[36] At some point between 1989 and 1992, Weber and other department directors began to use progressive disciplinary procedures. Weber testified that she discussed the disciplinary policy with Conway, with several CTI board members, and with various department directors. Then, at Conway's request, she "basically reduced to writing what CTI had practiced for several years." The judge pointed out that both CTI and Weber knew of the progressive discipline policy, that CTI department directors had regularly issued warnings and reprimands before terminating employees, that the policy contained no disclaimer that put employees on notice that the policies served only as general guidance, and that Weber continued to work at CTI after drafting the policy. These findings are supported by the evidence. We nevertheless conclude that the disciplinary policy created no implied or express contract between CTI and Weber, for three reasons.

First, the policy was not binding on CTI because it was not submitted to or approved by its board of directors. Whether a policy that restricts an employer's ability to discipline an employee is binding on the employer turns on the "context" of the policy's "preparation and distribution." See *O'Brien* v. *New England Tel. & Tel. Co.*, 422 Mass. 686, 694 (1996), quoting *Woolley* v. *Hoffmann-LaRoche, Inc.*, 99 N.J. 284, 299, modified on other grounds, 101 N.J. 10 (1985). The defendants introduced unrebutted evidence that the bylaws of CTI require that any personnel policy receive approval (by vote) of the board. Desjarlais may have instructed Weber to draft and to implement the discipline policy. Members of the CTI board's personnel subcommittee may have discussed the policy with Weber before she reduced it to writing. But there was no evidence that the

---

[36]The termination policy provides that a "Department Head, with the approval of the Executive Director, may discharge an employee without oral or written warning" for theft, insubordination, illegal acts, falsifying program records, lying, and immoral or illegal conduct. If none of those circumstances is present, an employee is entitled to progressive disciplinary measures, including "informal counseling," "written warning and counseling," and "probation" before discharge. The policy provides that "the duration of each step will depend upon the seriousness of the situation"; "in certain situations, probation may be the first disciplinary action taken."

CTI board either approved the policy, or delegated to Desjarlais (or to Weber) the authority to promulgate a disciplinary policy on behalf of CTI.[37] To the contrary, there was evidence that CTI's board had approved a personnel manual explicitly covering the termination of employees, but not requiring any system of progressive discipline.[38]

Second, by its own terms the policy does not apply to disciplinary action taken by CTI's executive director against a department head. The policy distinguishes between those employees who are supervised by, and therefore subject to disciplinary action by, a "department head," and the "executive director," who must approve any action recommended by the employee's "supervisor."[39] The policy does not require progressive discipline measures for a department head, such as Weber. There is no evidence that the policy had been followed when a department director was disciplined.

Last, Weber failed to establish that she relied on the terms of the policy as a condition of her continuing employment at CTI. Where an employee signs a personnel policy, negotiates specific terms as a condition of beginning or continuing employment, or where an employer calls special attention to the policy, a finding that the terms of the policy form the basis of an implied contract may be justified. See *O'Brien* v. *New England Tel. & Tel. Co.*, *supra* at 692-693, citing *Jackson* v. *Action for Boston*

---

[37]Canavan and Marie Sweeney, a member of the CTI board, both testified that they were not aware of this discipline policy. There was also evidence that, when Canavan terminated Weber, she did not bring to his or anyone's attention that her termination was improper because she had not been progressively disciplined in accordance with this policy.

[38]CTI's "personnel manual" states that "[a]ll decisions in . . . firing . . . are made by the Executive Director" and that "[a]n employee who has been discharged may appeal to the CTI Board Personnel Committee." To the extent that the board-approved "personnel manual" may have created any contractual obligations between CTI and Weber, there is no evidence that Weber exercised her rights by making such an appeal.

[39]The policy provides, for example, that "[a]fter receiving approval for an involuntary termination, the Department Head informs the employee of the termination." It also states that where discharge of an "employee" may be necessary, the "supervisor will prepare a written request for discharge and forward all probation documents to the Department Head and Deputy Director and then to the Executive Director for written approval before final action is taken."

*Community Dev., Inc.*, 403 Mass. 8, 15 (1988). There is no evidence that Weber assented to the terms of the progressive discipline policy as a condition of her own continuing employment. See *id.* The ad hoc implementation of the policy did not alter Weber's at-will employment status. See *id.* at 690. Canavan was entitled to terminate Weber without any warning or progressive discipline.

## VI

We next address the challenge to the judge's ruling that Canavan unlawfully interfered with Weber's advantageous relations with CTI.[40] That ruling must be vacated and the claim remanded to the Superior Court for further findings.[41]

In an action for intentional interference with advantageous relations, an employee must prove that (1) she had an advantageous employment relationship with her employer; (2) the defendant knowingly induced the employer to break that relationship; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the employee was harmed by the defendant's actions. See *Abramian v. President & Fellows of Harvard College*, 432 Mass. 107, 122 (2000), citing *G.S. Enters., Inc.* v. *Falmouth Marine, Inc.*, 410 Mass. 262, 272 (1991). Where, as here, the claim is asserted against an individual official of the employer, the plaintiff is required to show, as to "improper motive or means," that the "controlling factor" in the alleged interference was "actual" malice; "implied" malice is not sufficient. *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659, 664 (1981), *S.C.*, 391 Mass. 333

---

[40]The judge concluded that Weber failed to adduce sufficient evidence to prove her claim of tortious interference against defendant Conway. See note 4, *supra.*

[41]The defendants' argument that Weber's unlawful interference claim fails as a matter of law because G. L. c. 151B provides the exclusive remedy for employment discrimination· is without merit. See *Charland* v. *Muzi Motors, Inc.*, 417 Mass. 580, 586 (1994) ("[W]here applicable, G. L. c. 151B provides the exclusive remedy for employment discrimination not based on preexisting tort law"); *Comey* v. *Hill*, 387 Mass. 11, 20 (1982) ("[W]e do not view [G. L. c. 151B] as tending to narrow or eliminate a person's common law rights where applicable. The statute broadens existing remedies rather than requiring resort to it as exclusive of all other remedies") .

(1984).[42] We have defined the requisite "malice" in this context as "a spiteful, malignant purpose, unrelated to the legitimate corporate interest" of the employer. *Boothby* v. *Texon, Inc.*, 414 Mass. 468, 487 (1993). See *Wright* v. *Shriners Hosp. for Crippled Children*, 412 Mass. 469, 476 (1992), quoting *Sereni* v. *Star Sportswear Mfg. Corp.*, 24 Mass. App. Ct. 428, 432-433 (1987).

In ruling for Weber on her intentional interference claim against Canavan, the judge determined that Weber satisfied all four requirements, but she made findings as to the "improper motive" requirement only. The judge said that Canavan discharged Weber "for discriminatory reasons" and wanted to replace her "with someone he arbitrarily chose." The judge also cited "the callous and abrupt manner" in which Weber's employment was terminated, and Canavan's "subsequent treatment of her," in concluding that a "fair inference of malice" had been proven.

Canavan concedes that Weber met her burden on all but the "improper motive" requirement. As to motive, a conclusion that Canavan unlawfully discriminated against Weber might, but does not necessarily, support an inference of actual malice. See, e.g., *Ferguson* v. *Michael Foods, Inc.*, 74 F. Supp. 2d 862, 873 (D. Minn. 1999) ("Tortious interference by a corporate officer requires unjustified and malicious interference with an employment relationship, a potentially different concept than status-based discriminatory intent"). As noted in Part IV, however, the judge did not make all of the findings necessary to support a conclusion as to Canavan (or any defendant) that Weber's termination was motivated by unlawful discrimination. If on remand the judge determines that discriminatory animus was

---

[42]Although the parties did not raise the issue, we note that there is no evidence to suggest that Canavan was "indistinguishable" from CTI and therefore immune to a claim that he tortiously interfered with CTI's relations with Weber. See *Harrison* v. *NetCentric Corp.*, 433 Mass. 465, 478 (2001) (where corporate official is chief executive officer, chairman of the board, and large shareholder of closely held corporation, and alone made decision to terminate plaintiff, material issue of fact exists whether official and corporation are "indistinguishable"). While there is evidence that Canavan alone made the decision to terminate Weber, see note 34, *supra*, Weber could have appealed her termination to the personnel committee of CTI's board as provided in the board-approved personnel manual. See note 38, *supra*.

the determinative cause of Weber's termination sufficient to establish liability on Canavan's part, the judge may take that into account in determining whether a "spiteful, malignant purpose, unrelated to the legitimate corporate interest" of CTI, was the controlling factor in any interference by Canavan in Weber's advantageous relations with CTI. See *Brunner* v. *Stone & Webster Eng'g Corp.*, 413 Mass. 698, 705-706 (1992); *Wright* v. *Shriners Hosp. for Crippled Children, supra* at 476.[43]

Removing, as we must, from our consideration any finding of discrimination by Canavan, the remaining findings on which the judge relied are insufficient to prove actual malice by Canavan. While Weber's abrupt termination and Canavan's failure to explain his reasons to her may have been unfair and poor management practice, evidence that a corporate official engaged in "sloppy and unfair business practices" is an insufficient basis to negate the official's broad privilege to terminate an at-will employee. *Gram* v. *Liberty Mut. Ins. Co., supra* at 665. Canavan's behavior must rise to the level of personal hostility or ill-will to satisfy the malice standard. See *id.* at 664; *King* v. *Driscoll*, 418 Mass. 576, 587 (1994), *S.C.*, 424 Mass. 1 (1996); *Draghetti* v. *Chmielewski*, 416 Mass. 808, 816-817 (1994).

As to Weber's replacement, a manager's decision to replace an at-will employee with a less qualified employee, even one "he arbitrarily chose," as the judge found, does not support an inference of malice. See *Alba* v. *Sampson*, 44 Mass. App. Ct. 311, 316 (1998), citing *Gram* v. *Liberty Mut. Ins. Co., supra* at 665.

## VII

Immediately prior to closing arguments, the judge allowed Weber's motion to amend her complaint to state a claim for

---

[43]In her charge filed with the MCAD, Weber named Canavan individually as a respondent. No issue arises, therefore, as to whether Weber circumvented the administrative requirements of G. L. c. 151B, § 9, by asserting a claim of tortious interference based on unlawful discrimination. See *Sereni* v. *Star Sportswear Mfg. Corp.*, 24 Mass. App. Ct. 428, 432 n.7 (1987). See also S.C. Moriearty, J.F. Adkins, & S.L. Lipsitz, Employment Law § 6.47, at 276-279 (1995).

retaliatory discrimination under G. L. c. 151B, § 4 (4).[44] The judge found that several weeks after Weber was terminated, at her request Canavan agreed to furnish her with a letter of recommendation to prospective employers to assist her in obtaining employment. Weber then drafted a reference letter, which Canavan approved. Sometime later, on learning that Weber had filed a complaint with the MCAD, Canavan instructed CTI's director of personnel to decline to provide copies of the letter of reference because of Weber's pending MCAD action against CTI.

On the basis of these findings, the judge ruled that Weber had suffered retaliatory discrimination in violation of G. L. c. 151B, § 4 (4). Whatever the merits of that ruling, the question we must resolve is whether Weber's retaliation claim, raised for the first time after the close of the evidence, came too late. General Laws c. 151B, § 9, provides that a civil action brought pursuant to G. L. c. 151B must be commenced "not later than three years after the alleged unlawful practice occurred." It is undisputed that by 1993 Weber knew that Canavan and CTI would not provide her with letters of reference because of the discrimination charges she had filed with MCAD. She first asserted a claim for retaliatory discrimination at trial in April, 1997, nearly four years after Canavan committed his last allegedly retaliatory act.[45] Her retaliation claim is therefore barred by the applicable statute of limitations unless that claim "relates back" to her earlier pleadings. Whether her claim "relates back" turns on whether it "arise[s] out of the conduct, transaction, or occurrence" she alleged in her earlier pleadings, Mass. R. Civ. P. 15 (c), 365 Mass. 761 (1974). We conclude that it does not.

In her complaint filed in the Superior Court, Weber alleged facts and claims relating solely to her termination from CTI and to the defendants' earlier failure to promote her. There is no mention of any retaliatory behavior or retaliation claim. In the

---

[44]General Laws c. 151B, § 4 (4), provides that it shall be unlawful for an employer "to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under section five."

[45]Weber commenced her action in the Superior Court on December 10, 1993, and filed her first amended complaint on that same day. She did not move to amend her complaint again until the trial in April, 1997.

broadest sense, Weber's termination triggered her MCAD complaint, and her MCAD complaint resulted in Canavan's retaliatory conduct, if such it be. This is an insufficient nexus to satisfy the requirement that the later retaliation claim "arise out of" conduct, transactions, or occurrences in her original pleadings. See *Zakutansky* v. *Bionetics Corp.*, 806 F. Supp. 1362, 1365-1366 (N.D. Ill. 1992) (retaliation claim does not relate back where earlier, timely complaint contains "no hint of a retaliation claim"). The specific conduct of which Weber complains occurred before she commenced her action in the Superior Court, and in those pleadings there is no allegation concerning this conduct, or any charge relating to it.[46]

Permitting Weber to amend her complaint at such a late date would contravene "the major policy" behind a statute of limitations — the collection and preservation of evidence. See J.W. Smith & H.B. Zobel, Rules Practice § 15.9, at 446 (1974 & Supp. 2001). Weber's pleadings afforded the defendants no notice that they would be required to defend a claim of retaliatory discrimination. While the rules of "relation back" are liberal where a party seeks to amend a complaint after a statute

---

[46]In determining whether a retaliation claim "relates back" under the Federal analogue to Mass. R. Civ. P. 15 (c), 365 Mass. 761 (1974), the majority of Federal courts have concluded that the earlier pleadings must give notice of a retaliation claim if the facts asserted in the original pleadings are distinct from those asserted in connection with the later retaliation claim. See, e.g., Landis *vs.* Correctional Corp. of America-Leavenworth Detention Ctr., U.S. Dist. Ct., No. 98-2320-GTV (D. Kan. June 11, 1999) (retaliatory discharge claim does not relate back where earlier pleadings fail to allege that plaintiff suffered retaliation and claim "stems from a set of facts separate and distinct from those set forth in the original complaint"); *Kaup* v. *First Bank Sys., Inc.*, 926 F. Supp. 155, 158 (D. Colo. 1996) (additional retaliation claim relates back where initial complaint included retaliation claims and gave notice that plaintiff alleged a continuing course of retaliatory conduct); Katsiavelos *vs.* Federal Reserve Bank, U.S. Dist. Ct., No. 93C 7724 (N.D. Ill. Dec. 28, 1994) (claim relates back where "facts presented in plaintiff's retaliatory discharge claim are virtually identical to those in her discrimination claim" and timely EEOC complaint included retaliation claim); *Zakutansky* v. *Bionetics Corp.*, 806 F. Supp. 1362, 1365-1366 (N.D. Ill. 1992) (no relation back of retaliatory discharge claim where original pleadings "contained no hint of a retaliation claim"; "retaliatory discharge is a discrete claim, quite separate from that of the underlying discrimination"). But see *Davis* v. *University of Chicago Hosps.*, 158 F.R.D. 129, 132 (N.D. Ill. 1994) (retaliatory discharge claim relates back even though retaliation claim did not arise out of "precisely the same conduct" set forth in earlier pleadings).

of limitations has expired, the rules "are not so broad as to encompass any claim that was known to the complainant that could have been brought in a timely fashion." *Wynn & Wynn, P.C.* v. *Massachusetts Comm'n Against Discrimination,* 431 Mass. 655, 673 (2000). By October, 1993, Weber was clearly "aware . . . . of the facts that would point to her [retaliation] claim[]." *Id.* She delayed raising the claim for more than three years, and has offered no explanation for the delay. See *Mathis* v. *Massachusetts Elec. Co.,* 409 Mass. 256, 264-265 (1991) ("unexcused delay in seeking to amend [complaint] is a valid basis for denial of a motion to amend"). At that late date the defendants had no opportunity to gather and introduce such evidence as was required to refute her claim.[47]

## VIII

Because Weber has not yet succeeded on any of her claims, we need not address the defendants' claims that Weber's recovery under G. L. c. 151B was subject to a cap of $20,000 pursuant to G. L. c. 231, § 85K, or that the front pay awarded to her was speculative and therefore excessive.

The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

[47]Because we conclude that Weber's retaliation claim does not relate back to her original pleadings, we need not consider whether she was required to amend her administrative complaint in the MCAD to state a claim for retaliation as a prerequisite to advancing that claim in the Superior Court. See, e.g., *Davis* v. *University of Chicago Hosps., supra* at 130.