SCHOOL COMMITTEE OF BOSTON vs. LABOR RELATIONS
COMMISSION; BOSTON PUBLIC SCHOOL BUILDINGS
CUSTODIANS' ASSOCIATION, intervener.[1]

No. 94-P-1931.

Suffolk. February 15, 1996. - April 24, 1996.

Present: ARMSTRONG, GILLERMAN, & IRELAND, JJ.

*Administrative Law,* Judicial review. *Labor Relations Commission. Labor,*
Unfair labor practice, Discharge for union activity. *School and School
Committee,* Custodian, Termination of employment.

Substantial evidence, including circumstantial evidence, supported the
conclusion of the Labor Relations Commission that a union had made
out a prima facie case that an employer had violated G. L. c. 150E,
§ 10 (*a*) (1) and (3), by laying off certain provisional and temporary em-
ployees in order to interfere with the employees' right to vote in an elec-
tion to determine whether they would be added to the bargaining unit.
[330-332]
On appeal from a decision of the Labor Relations Commission, the
employer did not demonstrate that the commission was incorrect as
matter of law in concluding that the employer failed to meet its burden
of producing some evidence that its motive for laying off certain em-
ployees was nondiscriminatory. [332-336]

APPEAL from a decision of the Labor Relations Commis-
sion.

*Malcolm S. Medley*, Special Assistant Corporation Counsel,
for School Committee of Boston.

*John B. Cochran* for Labor Relations Commission.

*Matthew E. Dwyer & John P. Sheridan*, for Boston Public
School Buildings Custodians' Association, submitted a brief.

[1]The Labor Relations Commission is the appellee on appeal. However,
the Boston Public School Buildings Custodians' Association was the charg-
ing party before the commission; they appear in these appellate proceedings
as an intervener, and they have filed a brief in support of the decision of
the commission.

GILLERMAN, J. On June 25, 1992, the school committee of the city of Boston (school committee) notified thirty-nine provisional and temporary custodians[2] (custodians) that they were being laid off effective June 30, 1992. The Boston Public School Building Custodians' Association (union) filed charges with the Labor Relations Commission (commission) that the school committee had violated G. L. c. 150E, § 10(a)(1), (3) and (5), by laying off the custodians in order to interfere with their right to vote in a scheduled add-on election which was to be ordered on July 3, 1992.[3]

After an investigation, the commission issued a complaint alleging that the school committee had violated § 10(a)(1) and (3).[4] Thereafter, a hearing officer conducted evidentiary hearings and issued her recommended findings of fact. Subsequently, on the basis of the evidence at the hearings and the hearing officer's recommended findings, the commission made its findings of fact and issued its opinion that the school committee had violated § 10(a)(1) and (3) "by laying off the thirty-nine temporary and provisional custodians in retaliation for engaging in concerted, protected activity . . . ." The school committee appealed the decision of the commission to this court.

We review the commission's findings of fact in accordance with the standards set out in the State Administrative Procedure Act. See G. L. 150A, § 6(e), (f), incorporating G. L.

---

[2]Provisional and temporary custodians are not hired or appointed from a civil service list. The civil service law does draw distinctions between the two categories, but those differences have no relevance to this case.

[3]The purpose of the "add-on election" was to determine whether the temporary and provisional custodians wanted to be added to the custodial bargaining unit.

The hearing officer to whom the charges had been assigned had notified the parties on May 29, 1992, that the add-on election would be ordered on July 3, 1992, unless the school committee presented evidence to the hearing officer that the custodians ought not to be added on to the existing bargaining unit. It does not appear from the record that such evidence was presented to the hearing officer by June 25, 1992, the date the custodians were notified of their discharge.

[4]Section 10(a)(1) makes it a "prohibited practice" in public employee labor relations to interfere, restrain, or coerce any employee in the exercise of any right guaranteed under G. L. c. 150E. Section 10(a)(3) makes it a "prohibited practice" to discriminate in regard to any term or condition of employment in order to encourage or discourage membership in any employee organization.

c. 30A. We must affirm the commission's findings unless they are unsupported by substantial evidence. G. L. c. 30A, § 14(7). "Substantial evidence" is evidence that "a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1(6), inserted by St. 1954, c. 681, § 1. See *Trustees of Forbes Library* v. *Labor Relations Commn.*, 384 Mass. 559, 568 (1981). However, we are "free to examine the legal standards employed by the commission." *Ibid.* We conclude that there was substantial evidence in the record to support the commission's findings and that the commission employed the appropriate legal standards; thus, we affirm.

The commission identified the elements that the union, in the first instance, must establish in order to make its required prima facie showing that the school committee unlawfully discriminated against the custodians, namely: (1) that the custodians were engaged in protected concerted activities; (2) that the school committee knew of these activities; (3) that the school committee took adverse action against the custodians; and (4) that the adverse action was motivated by the school committee's desire to penalize or discourage the protected activity.[5]

If the union does make out its prima facie case including the employer's unlawful motive, the school committee then has the responsibility to come forward with "a lawful reason for its decision and [to] produce supporting facts indicating that this reason was actually a motive in the decision." *Trustees of Forbes Library, supra* at 566. The "supporting facts" must include " 'credible evidence . . . [which] show[s] that the reason or reasons advanced were the real reasons.' " *Blare* v. *Husky Injection Molding Sys. Boston, Inc.*, 419 Mass 437, 442 (1995), quoting from *Wheelock College* v. *Massachusetts*

---

[5]The elements of a prima facie case in an unfair labor practices case ordinarily include evidence that (1) the employee generally had a good work record; (2) that the employee had engaged in protected activities; and (3) that these activities were visible to the employer. See *Trustees of Forbes Library, supra* at 565 n.4. The fourth element referred to in the commission's opinion is the inference which the fact finder may draw from proof of the first three elements. See *Wheelock College* v. *Massachusetts Commn. Against Discrimination*, 371 Mass. 130, 137 (1976) ("proof of unlawful discrimination rarely can be established by direct evidence"). The elements (aside from the permissible inference) may vary depending on the factual situation. *Trustees of Forbes Library, supra* at 565 n.4. See, e.g., *McKenzie* v. *Brigham & Women's Hosp.*, 405 Mass. 432, 434-435 (1989); *Harrison* v. *Boston Financial Data Servs., Inc.*, 37 Mass. App. Ct. 133, 136-137 (1994).

*Commn. Against Discrimination,* 371 Mass. 130, 138 (1976). If the reason given "has no reasonable support in the evidence or is wholly disbelieved (and hence is transparently a pretext), the employee should prevail." *Wheelock College, supra* at 138.[6] See *Blare, supra* at 442 ("If the defendant fails to meet its burden, . . . then the presumption created by the preponderance of evidence supporting a prima facie case entitles plaintiff to judgment").

If the school committee satisfies its responsibility, the union must then persuade the commission that the discharge would not have occurred but for the committee's motive to interfere with the right of the custodians to vote in the forthcoming add-on election.[7] The burden of persuasion before the commission always remains with the union (or employee). *Trustees of Forbes Library, supra* at 566. However, as the party challenging the commission's decision on appeal, the school committee "has the burden of showing that the commission's action was invalid." *Quincy City Hosp.* v. *Labor Relations Commn.,* 400 Mass. 745, 749 (1987).

1. *The union's prima facie case.*[8] The school committee first argues that the union failed to make out a prima facie case of unlawful discrimination. The first three elements of the union's prima facie case are not in dispute: the employees were engaged in a protected activity — the attempt to participate in an election regarding a bargaining unit; the school committee knew of that activity; and the school committee, by terminating the custodians, obviously took action adverse

---

[6]*Wheelock College,* a sex discrimination case, falls within the area to which the court in *Trustees of Forbes Library* looked for the intermediate method of allocating the burden of proof under a "but for" standard. See *Trustees of Forbes Library, supra* at 565-567.

[7]The commission is required to apply a "but for" test in determining the critical issue whether the discharge was unlawfully motivated. The employee "bears the over-all burden of persuading the trier of fact that her employer would not have discharged her but for a discriminatory animus." *Trustees of Forbes Library, supra* at 565.

[8]"In the absence of contradictory evidence, prima facie evidence compels a finding in accordance therewith in civil cases." Liacos, Massachusetts Evidence § 5.8.5, at 236 (6th ed. 1994). Compare *Riffelmacher* v. *Police Commrs. of Springfield,* 27 Mass. App. Ct. 159, 166 (1989) (suggesting that a "prima facie case is made when the evidence barely preponderates toward a conclusion that discrimination has occurred . . ."). See also *Lewis* v. *Area II Homecare for Senior Citizens, Inc.,* 397 Mass. 761, 765 n.5 (1986).

to the interests of the custodians. See note 5, *supra*. From these undisputed facts, and from the additional facts described below, the commission drew the inference of the school committee's unlawful discrimination.

In August, 1991, the parties were unable to agree on the scope of the bargaining unit for custodians and the impending add-on election. On August 21, 1991, the union filed a charge of a prohibited practice with the commission, alleging that the school committee had refused to apply the provisions of the collective bargaining agreement to the custodians, and had refused to recognize the union as their bargaining agent. The commission responded that it would investigate the charges, but not until March 13, 1992.

Meanwhile, between January and April, 1992, the union and the school committee met about six times to discuss the impact of a required reduction of $345,000 in the custodial budget for fiscal 1992. After the union rejected a proposal to lay off all the custodians for the remainder of the 1992 fiscal year, the parties signed a comprehensive settlement agreement dated April 23, 1992, regarding a custodial budget reduction of $345,000. In brief, the parties agreed that the reduction would be achieved by requiring all the custodians (permanent, temporary, and provisional) to accept two days furlough (no work-no pay). On March 30, 1992, while these discussions were on-going, the union filed a representation petition to "add-on" the provisional and temporary custodians to the existing custodial bargaining unit. The union then withdrew its previously filed prohibited practices charge on April 15, 1992.

On May 13, 1992, the school committee and the union met to discuss the representation petition. While the school committee agreed that the thirty-nine custodians would be eligible to vote in the add-on election, they would not agree that later hired temporary custodians should be included in the bargaining unit. The meeting ended without any agreement and, on May 29, 1992, the hearing officer, as we have previously stated, notified the parties in writing that on July 3, 1992, she would order an add-on election. See note 3, *supra*.

Regarding the period immediately prior to the discharge notice, the commission found that, "[a]t no time, from May 13, 1992, [when the parties last met and were unable to reach an agreement] until June 25, 1992 [when the school commit-

tee notified the custodians of the termination of their employ- ment] did the school committee or its representative raise the possibility that the thirty-nine custodians who were the subject of the up-coming hearing and add-on election would be laid-off," and that this was so even though the school com- mittee was then working on the 1992 budget deficit, anticipat- ing only level funding for fiscal year 1993. A representative of the school committee who attended the May 13 meeting explained that while he knew that consideration was being given to possible layoffs of custodians for fiscal year 1993 as part of the effort to meet the anticipated level funding for fis- cal year 1993, he said nothing because he did not have any definite information about those plans.

While the foregoing evidence demonstrated that the deci- sion to discharge the custodians must have occurred sometime between May 13 and June 25, the commission found, there was "no evidence that any intervening event triggered the school committee's action." In that context, the fact that the termination notice of June 25 was only a few days before the add-on election was to be ordered (July 3), was an especially telling event, and the commission was justified in concluding, on the first phase of the case, that there was sufficient circumstantial evidence of the antiunion animus to sustain the union's prima facie case and thereby warrant a presump- tion of unlawful discrimination.[9]

2. *The response of the school committee.* The commission then considered the school committee's proffered reason for the layoffs. The school committee asserted that the discharge of the custodians was motivated by budgetary decisions — a proffer of a facially lawful reason. It was the responsibility of the school committee then to "produce supporting facts indicating that . . . [the proffered] reason was actually a mo- tive in the decision." *Trustees of Forbes Library, supra* at 566. As noted above, the "supporting facts" must include "cred-

---

[9]In addition to the evidence recited by the commission, there was also the evidence, recited earlier in this opinion, that the school committee undertook negotiations with the union regarding the impact of the required reduction in expenditures for fiscal year 1992, and that those discussions culminated in the agreed solution of April 23 regarding two furlough days. No such discussions occurred after May 13 and before the termination no- tice of June 25, a period during which the school committee was again working on the problem of reducing its expenditures for fiscal year 1993.

ible evidence" that the proffered reason was the real reason. *Wheelock College,* 371 Mass. at 138.

Having in mind that the school committee has the burden in this court of showing that the commission's decision was invalid, we look first to the school committee's recitation of its evidence of "supporting facts" offered in substantiation of the proffered reason for the layoff. The school committee's evidence[10] showed that beginning in February, 1992, the school committee and the superintendent began the budgetary process for the 1993 fiscal year which would begin July 1, 1992. In fiscal year 1992, the school department had exceeded its budget by $16 million, requiring an additional appropriation, the two-day furlough plan, and other reductions in expenditures. The target fiscal year 1993 budget received from city administration was the same as that originally received for the 1992 fiscal year, $378.5 million, and the directive to the school committee was that the fiscal year 1993 budget should be consistent with that level of appropriations.

As part of the effort to achieve that result, the school committee, in February, 1992, first projected a cut in custodial staff of sixty-two positions for fiscal year 1993; in April, the projected cut rose to eighty-five, and then to eighty-seven in June, 1992. In July, 1992, the projected cut fell to sixty-six.[11] As noted earlier, the layoff notices for the thirty-nine custodians were sent June 25, 1992. No other custodians were laid off, nor was there any evidence that there were budget reductions in any other of the areas of custodial administration.

From these facts, the school committee argues that "simple math" required the school committee to reduce its spending, and "[w]hile a reduction of up to eighty-seven custodians was

---

[10]Here we summarize the evidence referred to in the brief filed by the school committee, see Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975), all of which is substantiated by testimony in the transcript.

[11]The commission, in a footnote to its opinion, pointed out that the school committee was faced with a $16 million deficit for fiscal year 1992, and that the agreed two-day furlough plan required of all custodians made up the required custodial contribution of $345,000. The $345,000 contribution was part of an $8 million system-wide reduction in expenditures, the remaining $8 million of the deficit to be covered by a supplemental appropriation.

The brief of the school committee does not refer us to the projected deficit, if any, for fiscal year 1993.

projected, the school committee massaged the budget such that only provisional and temporary custodians were laid off." In short, the school committee argues that it had sustained its stage two burden before the commission.

The commission's opinion acknowledged that the evidence just described established that the school committee faced a declining budget for custodial operations. The difficulty, the commission said, was the failure of the school committee to introduce evidence on "certain critical issues. . . [including] the identity of the decision-maker, the date or time frame in which the decision was made, the rationale for laying off only the custodians scheduled to vote in the upcoming elections when the . . . [draft budgets] documented the necessity of reductions in staff in other positions, and an explanation for the silence at the May 13th meeting concerning even the *possibility* of laying off any custodians, including all of the voters under consideration. Nor did the committee produce evidence demonstrating that layoffs or budget reductions occurred in other areas of the school system . . . at the same time as the custodial layoffs." (Emphasis in original.)[12]

From these observations the commission concluded that while such evidence from the school committee could have established a nexus between the prevailing economic conditions and the layoffs, the failure to present such evidence left the school committee only with the argument that the commission "should infer a causal relationship between the fiscal constraints and the layoff from the fact that the two events occurred in the same time period," leaving the commission, in turn, with the speculation that the layoffs merely "happened to coincide with the exact scope of the bargaining unit at issue." On that basis, the commission concluded that the school committee had failed to produce evidence rebutting the presumption of discrimination created by the union's prima facie case.

The school committee argues that by analyzing the evi-

---

[12]It seems, also, that no consideration was given to the furlough plan which the school committee had adopted to assist in resolving the budget problem for fiscal year 1992.

As to the absence of evidence regarding the identity and the reasoning of the decision-maker, see *Bruner* v. *Stone & Webster Engr. Corp.*, 413 Mass. 698, 704 (1992) (in an employment discrimination case, evidence of the bias of the decision-maker may be essential to proof of discrimination).

dence as it did, the commission misapplied the procedure mandated by *Trustees of Forbes Library, supra* at 566, namely, that the commission effectively, and erroneously, switched the burden of persuasion from the union to the school committee.

It is most assuredly true that the school committee's burden at stage two was limited to articulating nondiscriminatory layoffs. Nevertheless, " 'articulating' a reason in cases of this kind requires the employer to produce not only evidence of the reason for its action but also underlying facts in support of that reason." *Wheelock College*, 371 Mass. at 136. Part of that burden on the employer is to "produce supporting facts indicating that this reason was actually a motive in the decision." *Trustees of Forbes Library*, 384 Mass. at 566.

The commission decided that this is precisely where the school committee's proof failed: it presented no direct evidence of the particular decision-making process — who the decision-maker was, and why or when the decision-maker made the layoff decision. See note 12, *supra*. Rather, the school committee depended entirely upon the argument that the commission should infer from circumstantial evidence that budgetary considerations were the motivation for the decision.

Whether or not an inference — in this case, a decisive inference — is to be drawn depends on the connection between two facts "in light of common experience." Liacos, Massachusetts Evidence § 5.8.6, at 243 (6th ed. 1994). Here the commission declined to draw the inference sought by the school committee.

In substance the commission concluded that the school committee's suggested reason of budgetary considerations, unaccompanied by evidence that it was in fact a reason for the decision, failed to satisfy the school committee's burden at stage two of the established analysis. The commission concluded, in other words, that the school committee's suggestions that the layoffs were the result of budgetary considerations, and that it was innocently coincidental that the layoffs affected only those custodians about to participate in a representation election, and occurred, without warning or discussion (contrary to recent practice) immediately before the election, was simply inadequate to rebut the union's prima facie case. That is not a switching of the burden of persuasion, as the school committee argues; it is an experienced calculation of whether the school committee carried its

stage two burden of producing *credible* evidence in support of its position.

We must, in a case significantly devoid of direct evidence of the primary facts involved in this controversy, defer to the judgment of the commission because it is "presumably equipped or informed by experience to deal with a specialized field of knowledge, [and its] findings within that field carry the authority of an expertness which courts do not possess and therefore must respect." *School Comm. of E. Brookfield* v. *Labor Relations Commn.*, 16 Mass. App. Ct. 46, 52 (1983), quoting from *Universal Camera Corp.*, v. *National Labor Relations Bd.*, 340 U.S. 474, 488 (1951). See also *Boston Police Superior Officers Fedn.* v. *Labor Relations Commn.*, 410 Mass. 890, 892 (1991) ("We generally accord considerable deference to the commission's disposition of a charge").

We conclude, therefore, that the commission is not shown to have been incorrect as matter of law in concluding that the school committee failed to meet its burden of producing some evidence that its motivation for the layoffs was budgetary. The commission's decision is affirmed.

*So ordered.*