RICHARD FOWLER *vs.* LABOR RELATIONS COMMISSION;
BOSTON WATER AND SEWER COMMISSION, intervener.[1]

No. 00-P-451.

Suffolk. February 19, 2002. - September 26, 2002.

Present: MASON, COHEN, & MILLS, JJ.

*Administrative Law,* Judicial review, Substantial evidence. *Labor Relations Commission. Labor,* Judicial review, Unfair labor practice, Discharge for union activity.

On appeal from a decision of the Labor Relations Commission (LRC) dismissing a complaint by a principal organizer of a campaign to unionize mid-level managers at a city's water and sewer commission (BWSC) contending that the BWSC's actions in demoting and subsequently firing him were taken in retaliation for his involvement in protected activity in violation of G. L. c. 150E, § 10(*a*)(1), (2) and (3), this court concluded that the LRC's decision was based on an erroneous view of the law and remanded the case for consideration under the proper legal framework, where there was direct proof that BWSC's management had been told by an informant that employees were engaged in union activity, and where the LRC could consider circumstantial proof on the issue of the BWSC's knowledge of the fired employee's activities, including evidence that the BWSC's asserted reasons for its adverse actions were a pretext. [97-103]

APPEAL from a decision of the Labor Relations Commission.

*Harold L. Lichten* for the plaintiff.

*John B. Cochran* for the defendant.

*Robert E. Holland, John Foskett, & Catherine S. Reidy,* for the intervener, submitted a brief.

COHEN, J. Soon after becoming one of the principal organizers of a campaign to unionize mid-level managers at the Boston Water and Sewer Commission (BWSC), Richard Fowler, a BWSC employee for nearly twenty years, was demoted and subsequently fired. He filed a charge with the Labor Relations

---

[1]The Boston Water & Sewer Commission was the responding party before the Labor Relations Commission. It appears in these appellate proceedings as intervener and has filed a brief in support of the decision of the Labor Relations Commission.

Commission (commission) contending that the BWSC's actions were taken in retaliation for his involvement in protected activity, in violation of G. L. c. 150E, § 10(*a*)(1), (2) and (3). The commission investigated, issued a complaint of prohibited practice, and referred the matter to a hearing officer. After a five-day hearing, the hearing officer issued recommended findings of fact that were favorable to Fowler; however, even though the commission largely adopted the hearing officer's findings, it ultimately determined that Fowler had failed to prove an essential element of his case: that BWSC senior staff knew that Fowler was engaged in union activity. The commission therefore dismissed the complaint.

Fowler appeals from the commission's decision, contending that the commission misapplied the law by requiring him to prove employer knowledge by "direct evidence" and by failing to consider circumstantial proof on this issue, including evidence that the BWSC's asserted reasons for its adverse actions were a pretext. He also argues that the hearing officer's recommended findings of fact included a finding of employer knowledge and that the commission failed to explain its rejection of that finding as required by the State administrative procedure act. See G. L. c. 30A, § 11(8). We agree that the commission's decision was based on an erroneous view of the law and remand the case for consideration under the proper legal framework.

Although appellate review of the commission's findings is limited to an examination of the record to ascertain if the findings are supported by substantial evidence, we review the legal standards employed by the commission for error of law without deference to its decision. See, e.g., *Boston Police Superior Officers Fedn.* v. *Labor Relations Commn.*, 410 Mass. 890, 892 (1991); *School Comm. of Boston* v. *Labor Relations Commn.*, 40 Mass. App. Ct. 327, 328-329 (1996). We begin by reiterating the elements of a prima facie case of discrimination based on protected activities before addressing the specific issues presented here.

In a protected activities case, the charging party must produce evidence to support the conclusion that (1) the employee engaged in concerted activity as defined by G. L. c. 150E, § 2; (2) the employer knew of this activity; (3) the employer took adverse action against the employee; and (4) the adverse action was

motivated by the employer's desire to penalize or discourage the protected activity. *School Comm. of Boston* v. *Labor Relations Commn., supra* at 329 & n.5. In this case, it was not disputed that Fowler's union organizing activities, which began in January, 1996, constituted protected concerted activity; nor was it disputed that thereafter the BWSC took adverse action against Fowler by demoting him from deputy superintendent of sewer operations to safety manager in July, 1996, and terminating his employment in October, 1996. The only issues in contention were employer knowledge and motivation.

With respect to employer knowledge, Fowler took the position that his organizing activities were conducted publicly and must have been known to the BWSC's executive director, Vincent Mannering, if not from Mannering's own observations or his discussions with other members of the senior staff,[2] then through information received from Mannering's longtime personal friend, Joseph Crossen. Crossen was a BWSC safety engineer who, in mid-1996, became a deputy superintendent of water and sewer with direct oversight over Fowler after his demotion to safety manager.

As elaborated in the margin, the commission made findings to the effect that Crossen served as a conduit of information to Mannering,[3] that Crossen and others close to Mannering, such as chief of staff Jay Porter, knew that union activities were afoot,[4] that Crossen closely supervised Fowler,[5] and that

[2]There was direct evidence, and the commission found, that Fowler's role in the organizing campaign came to the attention of BWSC general counsel Henry Luthin; but because there was no proof (and no finding by the hearing officer) that Luthin met with Mannering between the time that Luthin obtained this information and the time that Fowler was terminated, the commission declined to infer employer knowledge from this evidence.

[3]Mannering had asked his friend Crossen to relay his observations about the operations department so that Mannering would not be relying upon "sanitized information."

[4]Crossen was among those who were sent a letter from the International Brotherhood of Teamsters, Local 25 (teamsters), in June, 1996, soliciting their involvement in the union. He immediately shared the letter with Porter, who relayed it to Mannering. Others close to senior staff, including Mannering's own administrative assistant, also received this letter.

[5]Fowler reported directly to Crossen. Crossen kept close track of Fowler's performance and regularly met with Fowler to go over his work.

Fowler's union activities were open and well-known in the workplace.[6] The commission also concluded, as had the hearing officer, that Mannering and Crossen were not credible when they denied knowing of Fowler's role in the campaign.

Nevertheless, the commission declined to infer that Mannering and Crossen knew of Fowler's union organizing, observing that there was no direct evidence that Crossen knew of Fowler's involvement in the organizing drive, and that no inference of employer knowledge could arise merely from disbelief of Mannering's and Crossen's testimony. The commission explained that "[i]f Crossen's knowledge of Fowler's activity was proven by direct evidence, we could infer that he shared his knowledge of Fowler's role in the organizing drive by the fact that he told Porter that the employees were organizing a union." However, absent such direct evidence, the commission assumed that it could not infer that Crossen possessed knowledge of Fowler's role. This assumption led the commission to conclude that it would be "mere suspicion or speculation" to find employer knowledge on the record before it. It therefore dismissed the complaint on that basis, without considering the remaining element of Fowler's prima facie case — employer motivation.

Fowler does not disagree that, without more, disbelief of Mannering and Crossen did not establish the opposite of their testimony. See, e.g., *Prescott* v. *Board of Appeal on Motor*

---

[6]Between January and April, 1996, Fowler and the other principal organizer in the campaign, Deacon Perrotta, met with numerous mid-level managers to inform them of the organizing drive and ascertain their level of interest in becoming unionized. In April or May, 1996, when the teamsters indicated an interest in representing the potential bargaining unit, Fowler and Perrotta began campaigning specifically for the teamsters by first meeting with managers individually and later by holding small group meetings. Fowler met with over fifty managers individually and had fifteen to twenty small group meetings. These overtures took place on BWSC property, including the building where Mannering had his office. Fowler and Perrotta also held a large meeting at the South Bay Hotel in Boston, which was attended by seventeen managers and six or seven teamsters officials. At that meeting, Fowler sat in the front of the room and fielded questions from the managers and the teamsters officials. Later, Fowler and Perrotta distributed union authorization cards to employees at work. They also compiled the list used by the teamsters to send a letter and authorization cards to sixty-seven managers in the potential bargaining unit, including Crossen and Mannering's administrative assistants, although Fowler's name did not appear in this correspondence.

*Vehicle Liab. Policies & Bonds*, 42 Mass. App. Ct. 36, 38 & n.4 (1997); *Hopping* v. *Whirlaway, Inc.*, 37 Mass. App. Ct. 121, 126 (1994); *Atkinson* v. *Rosenthal*, 33 Mass. App. Ct. 219, 224 (1992). His quarrel is with the commission's assumption that he needed to introduce direct evidence that Crossen knew of his union activity as a legal predicate to a finding of employer knowledge. We agree with Fowler that the commission was mistaken on this point.

In cases arising under G. L. c. 150E, we may look for guidance, as did the commission, to Federal decisions applying the parallel provisions of the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151 et seq. (1994). See *Service Employees Intl. Union, Local 509* v. *Labor Relations Commn.*, 431 Mass. 710, 713-714 (2000); *Burlington* v. *Labor Relations Commn.*, 17 Mass. App. Ct. 402, 405 (1984). Cases decided under the NLRA establish, as a general principle, that employer knowledge of employee union activities may be found from circumstantial evidence from which a reasonable inference of knowledge may be drawn. See, e.g., *FPC Holdings, Inc.* v. *NLRB.*, 64 F.3d 935, 943 (4th Cir. 1995); *Montgomery Ward & Co.*, 316 N.L.R.B. 1248, 1253 (1995), enforced, 97 F.3d 1448 (4th Cir. 1996); *Regional Home Care, Inc.*, 329 N.L.R.B. 85, 85-86 (1999). An inference of knowledge may be "based on such circumstantial evidence as the timing of the alleged discriminatory actions; the [employer's] general knowledge of its employees' union activities; the [employer's] animus against the Union; and the pretextual reasons given for the adverse personnel actions." *Regional Home Care, Inc., supra* at 85-86. Each case is fact specific. Thus, for example, the National Labor Relations Board (NLRB) has inferred that an employer knew of a discharged employee's union activities from a totality of circumstances that included evidence of the employer's general knowledge of union organizing and the employee's overt participation in union activities. *Montgomery Ward & Co., supra* at 1253.[7]

Notwithstanding this authority, the commission declined to

---

[7]An inference of employer knowledge may also be drawn pursuant to the so-called "small plant doctrine," where the size of the plant, as well as other

infer employer knowledge in reliance upon *The American League*, 189 N.L.R.B. 541 (1971) — a case that the commission understood as requiring direct proof to establish an informant's knowledge that the complaining employee had engaged in union activity. *The American League* case arose from the termination, toward the end of the 1968 baseball season, of two American League umpires who were attempting to organize their cohorts to join an association previously established by National League umpires. Before their termination, the fired umpires had discussed this idea with other American League umpires and had met with a lawyer and with the National League association. Although these discussions were not entirely clandestine, the two organizers had attempted to keep knowledge of their efforts from League officials, and there was no evidence that any of those contacted had told management that organizing activity was taking place, much less that the fired umpires were behind it. Indeed, none of the numerous American League umpires who appeared as witnesses in the case testified that they had mentioned the organizing activities to League officials. On these facts, the hearing officer and the NLRB declined to infer employer knowledge.

Viewed in its factual context, *The American League* at most illustrates that employer knowledge need not be inferred when there is no direct evidence that anyone has reported union activity to the employer. *Id.* at 549. However, it does not stand for the extended proposition that direct proof must always be introduced to establish an informant's knowledge that the complaining employee was engaged in union activity.[8]

In the case at hand, the facts as found by the commission

considerations, make it likely that the employer observed the employee's union activity. See *United L-N Glass*, 297 N.L.R.B. 329 (1989). Here, the commission determined that the facts did not support the application of the small plant doctrine. As Fowler does not challenge that determination on appeal, we do not consider whether it was supported by substantial evidence.

[8]The same is true of *Synergy Gas Corp.*, 290 N.L.R.B. 1098, 1101 (1988), also relied upon by the commission. In that case, the discharged employee claimed that employer knowledge could be inferred because two members of management had sons who worked with the employee, and the sons may have reported his activities to their parents. The claim was rejected because there was no evidence, direct or circumstantial, to establish the likelihood that either of the sons would have made such a communication. Furthermore, the

were considerably stronger on the issue of employer knowledge than the facts in *The American League*. The commission adopted the hearing officer's finding, based on Crossen's own testimony, that Crossen received union organizing information in June, 1996, and immediately shared it with Porter, who, in turn, relayed it to Mannering. Thus, there was direct proof that management had been told by an informant that employees were engaging in union activity. As to whether Crossen knew of Fowler's involvement with the organizing campaign and shared that information with senior staff, direct evidence was not required, and the commission was free to draw that inference from other findings, adopted from those of the hearing officer, establishing Crossen's close supervision of Fowler, Fowler's openness in conducting the organizing drive, and Crossen's role as a conduit of information to Porter and Mannering. Drawing an inference from these facts would rest upon affirmative evidence and would not be predicated solely on disbelief of Mannering and Crossen. See *NLRB* v. *Joseph Antell, Inc.*, 358 F.2d 880, 883 (1966).

The commission also was entitled to consider whether the reasons advanced by the BWSC for demoting and terminating Fowler were a pretext[9] and, if so, to take that into account as an additional factor in deciding whether to infer employer knowledge. Although, by itself, "the unconvincing character of the employer's professed reasons for acting against an employee [does not] supply the otherwise missing proof of knowledge," *Tomateck, Inc.*, 333 N.L.R.B. No. 156, slip op. at 76-77 (May 8, 2001), it is well-established that pretext may be considered as part of the totality of circumstances from which employer knowledge may be inferred. See *NLRB* v. *Joseph Antell, Inc.*,

---

employee's union activities were not "intensive" and were not likely to have been observed.

[9] The BWSC claimed that Fowler was demoted and discharged because of over-all poor performance and his responsibility for the failure of a pumping station during a severe rainstorm in September, 1996. However, the commission found that Fowler received positive evaluations for many years up until he began his union activities; that Fowler was not given any negative performance evaluations, warnings or other counseling about alleged deficiencies in his performance in 1996; and that the BWSC did not consider Fowler responsible for the pumping station mishap.

*supra* at 883; *Montgomery Ward, supra* at 1253; *Regional Home Care, Inc., supra* at 85-86.

In view of our decision, we need not dwell on Fowler's claim that the commission ran afoul of G. L. c. 30A, § 11(8), by failing to give an adequate explanation for rejecting the hearing officer's statement that "Crossen knew of Fowler's involvement" with the union. See *Vinal* v. *Contributory Retirement Appeal Bd.*, 13 Mass. App. Ct. 85, 92 (1982); *Noone* v. *Contributory Retirement Appeal Bd.*, 34 Mass. App. Ct. 756, 764 & n.13 (1993). Although the statement was made in passing, we agree with Fowler that this was an implicit, if not explicit, finding that went beyond simply discrediting Mannering and Crossen, and that the commission rejected the finding. Nevertheless, we detect no c. 30A violation, because the commission adequately explained itself by opining that, on its view of the law, the evidence supporting such a finding was insufficient. The problem was not that the commission failed to give an explanation; it was that the explanation was based on an incorrect view of the law. On remand, it will be open to the commission to reassess its rejection of the hearing officer's finding in light of the correct legal standard.

The commission's decision is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*So ordered.*