NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

23-P-455                                     Appeals Court

  CITY OF NEWTON vs. COMMONWEALTH EMPLOYMENT RELATIONS BOARD.[1]


No. 23-P-455.

Suffolk.     January 12, 2024. – May 22, 2024.

Present:  Vuono, Wolohojian, & Ditkoff, JJ.


Commonwealth Employment Relations Board.  Employment,
     Retaliation.  Labor, Police, Unfair labor practice.
     Practice, Civil, Prima facie case, Presumptions and burden
     of proof.  Municipal Corporations, Police, Unfair labor
     practice.  Public Employment, Police, Transfer.  Police,
     Assignment of duties.


     Appeal from a decision of the Commonwealth Employment
Relations Board.


     Jaclyn R. Zawada, Assistant City Solicitor, for the
plaintiff.
     Lan T. Kantany for Commonwealth Employment Relations Board.
     Alan H. Shapiro for the intervener.


     WOLOHOJIAN, J.  This appeal involves a claim of retaliation

for engaging in union activity, in violation of G. L. c. 150E,

_____

     [1] Newton Police Superior Officers Association, MassCOP Local
401, intervener.

§ 10 (a) (3).[2] More specifically, the Newton Police Superior Officers Association, MassCOP Local 401 (union) claims that a sergeant in the Newton police department (department), John Babcock, was transferred from a day shift in the traffic bureau to a night shift in the patrol division in retaliation for his participation in protected union activities. After a three-day evidentiary hearing, a hearing officer of the Department of Labor Relations (DLR) found that the union failed to prove that the city of Newton (city) would not have transferred Babcock but for his protected activity. Instead, the hearing officer found that the city's primary reason for transferring Babcock was his unprofessional conduct in having a verbal altercation with a subordinate, together with earlier issues concerning Babcock's performance. The union appealed the hearing officer's decision to the Commonwealth Employment Relations Board (CERB). CERB reversed on the ground that the city failed to meet its burden of producing evidence of a nonretaliatory reason for the transfer. In other words, CERB concluded that the city failed to meet its burden of production at the second stage of the

_____

[2] "It shall be a prohibited practice for a public employer or its designated representative to . . . [d]iscriminate in regard to hiring, tenure, or any term or condition of employment to encourage or discourage membership in any employee organization." G. L. c. 150E, § 10 (a) (3). The parties proceed in this appeal on the assumption that § 10 (a) (3) applies to this case, and therefore, we do not consider whether that assumption is correct.

familiar burden-shifting framework used in cases where, such as this one, there is no direct evidence of retaliatory motive. See Trustees of Forbes Library v. Labor Relations Comm'n, 384 Mass. 559, 561 (1981) (Forbes). On that basis, CERB did not reach the question whether the union met its burden of proving that Babcock would not have been transferred but for retaliation.

The city has appealed CERB's decision and raises three issues. First, the city argues that at the first (prima facie) stage of the burden-shifting analysis, the union was required to establish, among other things, that Babcock had a generally good work record, see Forbes, 384 Mass. at 565 n.4, and that the union failed to meet that burden. Second, the city argues that Babcock's transfer from a day shift to a night shift was not an adverse employment action because it carried an increase in pay. Third, the city argues that CERB erred in finding that the city failed to prove that its lawful reason for the transfer was a motive for Babcock's transfer.

We conclude that CERB correctly determined that the union was not required to prove a generally good work record at the prima facie stage of a retaliation claim under G. L. c. 150E. The correct legal standard at the prima facie stage of a c. 150E retaliation claim is that (1) the employee engaged in concerted protected activity, (2) the employer knew of that activity, (3)

the employer took an adverse employment action, and (4) there was a causal connection between the protected activity and the adverse action. But we also conclude that CERB mistakenly applied the wrong standard for determining what constitutes an "adverse employment action" in c. 150E cases. We also conclude that CERB erroneously overlooked the significance of the terms of the collective bargaining agreement (CBA) between the city and the union in determining whether Babcock's transfer to a night shift constituted an "adverse employment action." In claims brought under c. 150E by public employees who are union members, such as this one, the terms and conditions of employment must be assessed in the context of those conditions as negotiated in the CBA. Here, Babcock received the negotiated pay raise associated with assignment to a night shift as provided for in the CBA, and he did not prove any other change to the terms and conditions of his employment. Although we do not foreclose the possibility that a union member's reassignment from a day shift to a night shift (or vice versa) may, upon an appropriate factual showing, constitute an adverse employment action, no such showing was made here. Finally, CERB erred in concluding that the city failed to meet its stage two burden of production on the ground that the city did not come forward with direct evidence of the reasons for Babcock's transfer. The city

could -- and did -- meet its stage two burden by producing circumstantial evidence.  We accordingly reverse.

Background.  With the exception of one finding regarding the amount of the pay differential (which we set out in the margin),[3] neither side argues that any of the hearing officer's extensive written findings was not sufficiently supported by the evidence.  See Brookfield v. Labor Relations Comm'n, 443 Mass. 315, 321 (2005).  Indeed, our own independent review of the hearing transcript and exhibits confirms that all of the hearing officer's subsidiary findings (with the exception of that same finding) were amply supported by the evidence adduced during the three-day evidentiary hearing she conducted.  Those findings were based not only on the evidence, but also on the hearing officer's observation of the demeanor of the witnesses.  With that background in hand and reserving certain facts for later discussion, we summarize the hearing officer's findings, supplemented by certain undisputed facts, pertaining to the charge that Babcock was transferred to the patrol division in retaliation for his union activity.

---

[3] The hearing examiner found that Babcock could earn more working details on the day shift than he could earn by virtue of the eight percent night shift pay differential.  There was no evidence to support this finding, a matter that both CERB and the union implicitly acknowledge.

Babcock was hired as a patrol officer in 1987, and some time thereafter, he was assigned to the traffic bureau. On October 6, 2009, Babcock was promoted to the rank of sergeant in the traffic bureau,[4] where (among other things) he supervised safety officers, traffic officers, and civilian employees who worked within the traffic bureau. Over time, Babcock worked different shift schedules. That said, from 2016 to 2018, Babcock worked a 7 A.M. to 3 P.M. shift, Monday through Friday, with weekends off.

The traffic bureau handles special events, such as road races, as well as road construction projects. From 2012 to 2017, Babcock was involved in contacting the detail office to staff officers for police details relating to special events. However, in 2017, after there were issues with this arrangement, the chief of police, David MacDonald, appointed Lieutenant Daniel Walsh to oversee all details.[5] As part of this change, Babcock was instructed to direct detail staffing questions to

---

[4] The union represents superior officers of the department, including sergeants, lieutenants, and captains, with the exception of those serving as executive officer and internal affairs officer, who are exempt from the union's bargaining unit.

[5] In August 2016, the executive officer at the time reported that Babcock had over the years involved himself in all areas of details, which had proved problematic. As such, the department organized details in such a way that Walsh handled construction details, while Babcock handled details for special events.

Walsh and not to offer opinions on the staffing of details. Notwithstanding these instructions, Babcock had a conversation with a contractor about an upcoming line painting project. Babcock contended that the conversation pertained solely to whether the street should be closed during the painting project. On the other hand, the contractor said that Babcock made a recommendation regarding the number of detail officers to use for the project. Walsh informed Babcock that Babcock's staffing plan unnecessarily increased the number of detail officers and had a negative effect on the day shift. In addition, Walsh reminded Babcock that recommendations for detail staffing were to come to him (Walsh). In November 2017, Babcock was reminded again of these instructions, although it is not clear what prompted the need for the reminder at that time.

Approximately four months later, on March 9, 2018, Parking Control Officer Dorothy Crowley requested to speak with Babcock, who was her supervisor. Crowley wished to speak with Babcock about a past incident relating to the vandalization of her bicycle, which she believed was caused by someone at the department. She also alleged that her coworkers had vandalized her car by carving "rat" into a side panel. During the interaction, both Babcock and Crowley raised their voices and became upset. The verbal altercation was loud enough that it could be heard in some detail by those who were present in the

traffic bureau at the time and disrupted the workplace. Ultimately, Crowley left in tears and was placed on administrative leave. She has never returned to work.

When informed of this episode, the police chief instructed Lieutenant George McMains to inquire further and to collect statements from all officers who had been present when the exchange between Babcock and Crowley took place. McMains followed this instruction and collected numerous statements including ones from Babcock and Crowley. Crowley stated that she asked Babcock why he had not written a report about the past incidents, and he then raised his voice and yelled at her, "Don't put this on me, that was your decision, not mine." Crowley went on to write that she told Babcock, "I can't go on working where I don't feel safe and without help from my bosses. I'm working in a police station. I should feel safe here and I don't." Crowley told Babcock that she was "done and could not take this anymore."

McMains wrote an investigative report, dated March 23, 2018, in which he concluded that Babcock had violated the department's code of conduct concerning courtesy[6] because, as a

---

[6] See Newton Police Department Code of Conduct, section V. Professional Conduct and Responsibilities, 14 ("Courtesy -- All employees shall be courteous and considerate to the public and respectful to their superior officers, to their fellow officers and to all other members of the department. They shall be

supervisor, he could have conducted the discussion in private out of earshot of other employees but had instead allowed the disruptive behavior to take place with no regard for the fact that other employees could hear the interaction.

One week later, on March 30, 2018, the police chief wrote a letter of reprimand to Babcock in which he stated:

> "All Newton Police Department employees are expected to be professional and respectful to all other employees. Supervisors are sometimes required to have difficult conversations with subordinates and conduct themselves with professionalism and decorum.  In these types of occurrences a supervisor should have these conversations in a private setting out of the earshot of other employees.  The Traffic Bureau offers several places a private conversation could be conducted.  In this incident you made no effort to relocate your conversation with PCO Crowley and engaged in a contentious exchange.  Your actions in this matter are conduct unbecoming a Newton Police superior officer and merit[] discipline."

The police chief found that Babcock violated the courtesy provision of the code of conduct and stated that Babcock was being issued a letter of reprimand as a result.

Three weeks later, on April 23, 2018, Babcock was informed that he was being transferred from his day shift in the traffic bureau to a night shift in the patrol division.  When Babcock asked the police chief why he was being transferred, the chief responded that "he was the Chief, therefore he can do what he wanted" and that the "conversation was over."  The change to a

---

tactful in the performance of their duties and are expected to exercise the utmost patience and discretion").

night shift resulted in Babcock receiving an eight percent pay increase known as a "shift differential."

We now turn to Babcock's union activities.  There is no doubt that Babcock was deeply involved in union activities at all pertinent times.  From 2014 to 2016, Babcock was vice president of the union, and he was part of the contract bargaining team.  In addition, Babcock was involved in many communications between the union and the police chief regarding labor-management issues.  On occasion, the police chief's comments could be construed to reflect antiunion sentiment.  We recite the hearing officer's specific findings on these matters next.

1.  Travel time.  During a 2015 negotiating session, a discussion about extending a travel time benefit to superior officers became heated and the police chief said to someone other than Babcock, "if you don't like what you are receiving now as a supervisor, then go back to the patrolman union," or words to that effect.  The following year, on July 14, 2016, when the parties were again negotiating over the contract, the topic of travel time was again discussed.  Babcock and others informed the police chief that they believed he (the chief) was trying to impermissibly implement a new policy regarding travel time outside of contract negotiations.  Babcock handed the police chief a copy of the city's issues for negotiations of the

successor contract, which included travel time. The police chief became upset, but he took the document outside of the room to make a copy. When he returned, he said that he rejected the document and threw it at Babcock, resulting in Babcock receiving a paper cut. Babcock insisted on an apology, and the police chief ultimately offered to Babcock the statement that "[I] get[] hot, I get wordy, and I'm sure I didn't mean what I did" or words to that effect.

The issue of travel time remained unresolved during the summer of 2016, when Babcock demanded that the police chief rescind changes to travel time for superior officers. The police chief refused, taking the position that the union had been notified of the change three years earlier and then failed to request to bargain. In 2017, the union petitioned the joint labor management committee to resolve outstanding contract issues, and ultimately the parties met with a tripartite-interest arbitration panel, which issued an award in 2019.

2. Grievances. In late September 2016, the police chief ordered that an officer submit to a psychological test. At the officer's request, Babcock was present at the meeting with the police chief, and he argued with the chief over his authority to order the test. The union filed a prohibited practice charge, and Babcock testified for the union at the DLR hearing. After the union filed the charge, Babcock and the police chief had

several conversations about the underlying matter. During one of those conversations, the police chief told Babcock that the union should stop fighting the matter and that Babcock was being an "obstructionist."

In October 2017, Babcock filed two grievances on behalf of the bargaining unit, alleging that the police chief violated the CBA when he failed to hire a sergeant for a detail. On March 30, 2018 -- less than one month before Babcock was transferred to the night shift in the patrol division -- Babcock filed a grievance on behalf of all superior officers alleging that the police chief violated the overtime, special leave, and hours of work articles of the CBA.

As we noted at the outset of this opinion, the union filed a charge of prohibited practice with the DLR alleging that Babcock's transfer to the night shift in the patrol division violated G. L. c. 150E, § 10 (a) (3), because it was taken in retaliation for his protected union activities. After a three-day evidentiary hearing, the hearing officer ruled in favor of the city, making the extensive findings we have set out above. The hearing officer acknowledged that Babcock was transferred to the patrol division less than one month after he had filed a grievance on behalf of another officer. But the hearing officer concluded that timing alone was not enough to support a finding that the city was unlawfully motivated in transferring Babcock.

Instead, the hearing officer credited the city's position that Babcock was transferred to the patrol division because of the altercation with Crowley the month before the transfer, as well as Babcock's repeated failures within the previous year to comply with the revised procedures regarding details. The hearing officer gave particular weight to the fact that it was McMains -- not the police chief -- who concluded that Babcock had conducted himself in an unprofessional manner and that there was absolutely no evidence that McMains harbored antiunion animus or a negative opinion of Babcock. The hearing officer also noted that there was no evidence to suggest that the police chief influenced McMains in any way. In addition, the hearing officer noted that it was reasonable for Babcock to be transferred from the traffic bureau, where he had demonstrated unprofessional conduct toward his subordinates, to the patrol division, where he could have a fresh start as a supervisor.

The union appealed to CERB. CERB did not reject any of the subsidiary factual findings made by the hearing officer.[7]

---

[7] The hearing officer's findings were not immune from review by CERB:

"Nonetheless, all subsidiary findings made by the [hearing officer] are entitled to some deference by [CERB], and those findings that are based on credibility determinations by the [hearing examiner] are entitled to substantial deference. Where it rejects such findings, [CERB] must provide a considered articulation of the reasons underlying

Instead, CERB reversed the hearing officer's decision on the ground that -- in the absence of <u>direct</u> evidence of the reason Babcock was transferred to the night shift -- the city had failed to meet its burden of production at the second stage of the burden-shifting framework used for establishing retaliation. This appeal followed.

<u>Discussion</u>.  Where, as here, there is no direct evidence of a retaliatory motive, a claim of retaliation under G. L.

---

that rejection.  The deference required in review of factual findings will permit [CERB] to conduct a meaningful review of a [hearing officer's] findings to determine whether they are significantly against the weight of the evidence, or . . . suspect in light of the consistency and inherent probability of testimony.  The requirement of an explanation will help ensure that [CERB] will carefully consider any decision to reject a [hearing examiner's] findings and that it will provide a reviewing court with an adequate explanation on which to determine whether that rejection was warranted.  This test must be considered against the fundamental rule rooted in due process that a reviewing body ordinarily may not reverse a credibility judgment made by the administrative or judicial officer who actually heard the testimony of the witness and found him or her to be credible.  It is inappropriate to ask [an appellate panel who has not heard the witness] to reverse a judge's findings involving credibility, since he saw the witnesses and we did not.  As we have explained, a determination of credibility made by one who actually heard a witness is close to immune from reversal on appeal except on the most compelling of showings."  (Quotations, footnote, and citations omitted.)

<u>Hollup</u> v. <u>Worcester Retirement Bd.</u>, 103 Mass. App. Ct. 157, 160-161 (2023).  See <u>Morris</u> v. <u>Board of Registration in Med.</u>, 405 Mass. 103, 109, cert. denied, 493 U.S. 977 (1989) (reviewing board should not disregard trier of fact's findings on credibility).

c. 150E, § 10 (a) (3), may be proved by following the burden-shifting framework used for similar claims asserted under G. L. c. 151B.  See Forbes, 384 Mass. at 561-562 (burden of proof should be allocated according to procedure described in G. L. c. 151B cases).  Under this burden-shifting paradigm, "the employee must bear the ultimate burden of persuasion, but may rely on a prima facie showing to shift to the employer a limited burden of producing evidence."  Id. at 562.  At the first stage, the plaintiff has the burden of producing evidence that the plaintiff engaged in "protected activity" that "was plainly visible to the employer," id. at 565 n.4, "that [the plaintiff] suffered some adverse action, and that 'a causal connection existed between the protected conduct and the adverse action.'"  Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 474 Mass. 382, 406 (2016), quoting Mole v. University of Mass., 442 Mass. 582, 591-592 (2004) (retaliation under G. L. c. 151B).  "Proof of a prima facie case shifts to the employer the responsibility to . . . state a lawful reason and produce supporting facts indicating that this reason was actually a motive in the decision."  Forbes, supra at 566.  "The employer's burden following a prima facie showing of [retaliation] is only a responsibility to produce evidence.  Once the employer has proposed a reason and presented supporting facts, the presumption of [retaliation] is dispelled."  Id.  At the third

stage, the employee has the burden to "prove by a preponderance of evidence that the [employer's] asserted lawful reason was not the real reason" for the adverse employment decision. Id. The employee bears the over-all burden of proving that the adverse employment action would not have been taken "but for" retaliation. Id. at 565. "[I]f the evidence is in balance, the employer must prevail." Id. at 566.

Against this well-established framework, we consider the city's three arguments on appeal.

1. Stage one -- proof of "generally good work record." The city argues that, at the prima facie stage, the union bore the burden of proving that Babcock had a "generally good work record." The argument is based on note 4 in Forbes, which states that a "prima facie showing in an unfair labor practice case might include proof that an employee had a generally good work record, that he had engaged in protected activity, and that this activity was plainly visible to the employer" (emphasis added). Forbes, 384 Mass. at 565 n.4. The court reached this nebulous statement by analogy to the prima facie showing required under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). But McDonnell Douglas was a race discrimination case -- not a retaliation claim -- and our cases have made clear that "[a] claim of retaliation is separate and distinct from a claim of discrimination." Verdrager, 474 Mass. at 405.

In cases of retaliation (whether under State or Federal law) a plaintiff need not prove a "generally good work record" at the prima facie stage. See Psy-Ed Corp. v. Klein, 459 Mass. 697, 707 (2011), quoting Mole, 442 Mass. at 591-592 ("to make out a prima facie case of retaliation [under G. L. c. 151B], the plaintiff must show that 'he engaged in protected conduct, that he suffered some adverse action, and that 'a causal connection existed between the protected conduct and the adverse action'"); Planadeball v. Wyndham Vacation Resorts, Inc., 793 F.3d 169, 175 (1st Cir. 2015) (for Title VII retaliation claim, prima facie case requires proof that plaintiff "undertook protected conduct[,] her employer took a material adverse action against her[,] [a]nd a causal nexus exists between elements one and two"). Thus, whatever the Forbes court may have meant when it said that a prima facie case of retaliation "might" include proof that the employee had a generally good work record, we are confident that the court did not intend to impose an obligatory additional element of proof on the employee at the prima facie stage of a retaliation claim.

To conclude otherwise would have the undesirable consequence of making an employee's burden at the prima facie stage of a retaliation claim under G. L. c. 150E more onerous than the burden an employee bears under G. L. c. 151B. See Verdrager, 474 Mass. at 406, quoting Mole, 442 Mass. at 591-592.

There is nothing to indicate that the Supreme Judicial Court intended note 4 of Forbes to have that counterintuitive effect. Indeed, to the contrary, the Forbes court held that "the rules governing the burden of proof in sex discrimination cases should apply in unfair labor practice cases as well," Forbes, 384 Mass. at 567, thus signifying that the burdens under both statutes should be the same.  Our conclusion is further buttressed by the fact that in note 4, the court used the word "might" (signifying potentiality or possibility), and avoided the word "must" (signifying a mandatory requirement).  See Black's Law Dictionary 992, 1019 (6th ed. 1990) ("might" means something is possible; "must" has mandatory effect).

Nonetheless, we acknowledge that a small number of cases since Forbes have repeated the language of note 4 in a way that could potentially suggest a different reading.  In Southern Worcester County Regional Vocational Sch. Dist. v. Labor Relations Comm'n, 386 Mass. 414, 420 (1982), the Supreme Judicial Court noted that the plaintiff schoolteachers had proved generally good work records as part of their proof of a prima facie case of retaliation.  In Babcock v. Labor Relations Comm'n, 14 Mass. App. Ct. 650, 652 n.2 (1982), the language of note 4 was quoted without further discussion in a note. Similarly, the language of note 4 was included in a note of School Comm. of Boston v. Labor Relations Comm'n, 40 Mass. App.

Ct. 327, 329 n.5 (1996), not only without elaboration but also at odds with its own recitation of the required elements at the prima facie stage in the body of the opinion. None of these three cases examined the language of note 4 in any detail. And none of these cursory subsequent case references persuades us that the Supreme Judicial Court intended note 4 to impose an additional element of proof on a G. L. c. 150E plaintiff at the prima facie stage to establish a "generally good work record." Accord School Comm. of Boston, 40 Mass. App. Ct. at 329 (1996) (elements of retaliation claim under c. 150E); Babcock, supra at 651-652 (1982) (same).

2. Stage one -- adverse employment action. The city argues that transferring Babcock to a night shift in the patrol division did not constitute an adverse employment action given that it came with an increase in pay. The phrase "adverse employment action" does not appear in G. L. c. 150E, "but we use the phrase to determine when an act of discrimination against an employee [in 'hiring, tenure, or any other term or condition of employment'] may be remedied under" c. 150E. Yee v. Massachusetts State Police, 481 Mass. 290, 295 (2019). "Where an employer discriminates against an employee but the discriminatory act falls short of being an 'adverse employment action,' c. [150E] affords the employee no remedy for the discrimination." Id. at 295-296. "[A]n action taken by an

employer is an 'adverse employment action' where it is 'substantial enough to have materially disadvantaged an employee.'" Id. at 296, quoting Psy-Ed Corp., 459 Mass. at 707-708.

> "'Material disadvantage for this purpose arises when objective aspects of the work environment are affected.' . . . The disadvantage must be objectively apparent to a reasonable person in the employee's position; 'subjective feelings of disappointment and disillusionment' will not suffice."

Yee, supra at 296-297, quoting King v. City of Boston, 71 Mass. App. Ct. 460, 468 (2008), and MacCormack v. Boston Edison Corp., 423 Mass. 652, 663 (1996).

A lateral transfer may constitute an adverse employment action under G. L. c. 150E if an employee can show that there are material differences in "any term or condition of employment." G. L. c. 150E, § 10 (a) (3). See Yee, 481 Mass. at 297. Because the terms and conditions of public employees who are union members are the product of required negotiation between the municipality and the union, see G. L. c. 150E, § 6, the determination of whether there has been a material change in the terms or conditions of employment of a public employee sufficient to constitute an adverse employment action must be assessed against the provisions of the CBA. See Yee, supra at 299 n.8; Somerville v. Commonwealth Employment Relations Bd., 470 Mass. 563, 572-573 (2015). CERB mistakenly overlooked this

important aspect of a retaliation claim under c. 150E.[8]  See

G. L. c. 150E, § 10 (a) (3).

Here, the disadvantage of working a night shift versus a day shift was a matter of negotiation between the city and the union, and the CBA contained a specific provision requiring that sergeants such as Babcock receive an increase in pay known as a "night shift differential" when assigned to a night shift.[9] Babcock received the bargained-for pay differential when he was transferred; accordingly, he suffered no adverse employment action as measured against the terms of the CBA.

Nonetheless, CERB concluded that a reasonable person in Babcock's shoes would view a "sudden involuntary transfer" from a day shift with weekends and holidays off to a night shift with a rotating schedule to be a "material and objective change in terms and conditions of employment."  To support this conclusion, CERB cited to dicta in two Federal cases that a

---

[8] Chapter 151B claims are not confined to public employees who are union members whose employment is the subject of a CBA.

We note that the statutory language concerning the remedial scope of c. 151B is not exactly the same as that for c. 150E; c. 151B protects against retaliatory changes to an employee's "compensation or in terms, conditions or privileges of employment."  G. L. c. 151B, § 4 (1).

[9] The version of the CBA contained in the appellate record refers to a seven percent night shift differential, but the hearing examiner and CERB found that that the differential was eight percent, a figure that neither side disputes.

lateral transfer from a day shift to a night shift (or vice versa) might constitute an adverse employment action even if it involves no reduction in pay.[10]  See Freedman v. MCI Telecomm. Corp., 255 F.3d 840, 844 (D.C. Cir. 2001); Ginger v. District of Columbia, 477 F. Supp. 2d 41, 50 (D.D.C. 2007), aff'd, 527 F.3d 1340 (D.C. Cir. 2008), cert. denied, 555 U.S. 1101 (2009). However, CERB overlooked important language and distinctions in those cases.  Specifically, CERB overlooked that such a lateral transfer may be an adverse employment action if "other changes in terms, conditions, or privileges followed from the transfer." Freedman, supra at 844.  In Freedman, there was evidence that the transfer interfered with the plaintiff's education.  Id.  In Ginger, there was evidence that the plaintiffs lost their night shift pay differential, lost daytime detail opportunities, lost part-time work, and incurred additional childcare expenses. Ginger, supra at 49-50.

That is not the situation here.  Although Babcock contends that his transfer to the night shift disadvantaged him because he could earn more money on the day shift by working details than he would receive from the night shift differential, there was no evidence of this.  Indeed, CERB itself acknowledged that

---

[10] Both cases were decided aversely to the employees on dispositive motions.

there was no evidence that Babcock sustained a monetary loss as a result of the transfer.

Instead, Babcock's testimony of the disadvantage of the night shift was that

> "[it] was a whole change of lifestyle, so for a few extra dollars it really didn't put me at ease.  I can make up the money on details if I was really interested in the money. It was more a normal life schedule and weekends off was more important, family life, than getting an extra eight percent every night."

We, of course, do not minimize the importance of family life or the effect that a change in work schedule may have on it.  But that is not the question here, which instead turns on whether the union established an objective material change in the terms and conditions of Babcock's employment.  In this context, it is also important to take into account the inherent authority of police chiefs to assign officers to duties and schedules as they see fit to preserve public safety.  See G. L. c. 41, § 97A; Framingham v. Framingham Police Officers Union, 93 Mass. App. Ct. 537, 542-543 (2018).  In short, the union failed to establish an objective and material effect on the terms or conditions of Babcock's employment.

Our conclusion should not be read to mean that a change in shift from day to night (or vice versa) may never be an adverse employment action.  We simply conclude that because the union failed to establish either any deviation from the terms of the

CBA regarding night shifts or any other objective and material effect on the terms and conditions of Babcock's employment, one was not proved here.

3. Stage two -- employer's burden of production. Although not necessary to the outcome of this appeal, we take this opportunity to discuss the stage two burden of production since it was the basis upon which CERB reversed the decision of the hearing officer. As we have already stated, the employer's burden at stage two is one of production, not of persuasion. See supra at    . CERB understood this burden to require that the city produce direct evidence of the reason Babcock was transferred to a night shift in the patrol division. In other words, CERB concluded that the city could not meet its stage two burden of production based only on circumstantial evidence. This is incorrect as a matter of law. See Fowler v. Labor Relations Comm'n, 56 Mass. App. Ct. 96, 100 (2002) (direct evidence not required to meet stage one burden of proof for G. L. c. 150E claim). Provided there is credible evidence from which a reasonable inference may be drawn to support the employer's articulated reason for the employment action, the employer's burden of production at stage two is met. Cf. School Comm. of Boston, 40 Mass. App. Ct. at 335-336 (lack of direct evidence was so complete that no reasonable inference could be drawn).

Here the city's position was that Babcock was transferred out of the traffic bureau after he engaged in a disruptive altercation with a subordinate in that bureau. The city also pointed to Babcock's history of noncompliance with the new system governing traffic details -- which was a function of the traffic bureau. There was contemporaneous documentation of both sets of issues. To be sure, there was no contemporaneous documentation giving the reason for Babcock's transfer; the police chief did not give Babcock any explanation for the transfer when Babcock inquired, and he did not testify at the evidentiary hearing. But the timing of the events, combined with the hearing examiner's belief that McMains (who conducted the investigation into Babcock's altercation with Crowley) testified truthfully, and the lack of any evidence that McMains harbored antiunion sentiment, were sufficient to create a reasonable inference to support the city's articulated reason for the transfer. Although a contrary inference also reasonably could have been drawn given Babcock's involvement in union activities around the same time, and comments by the police chief that could be (but were not required to be) construed to reflect antiunion views, the evaluation of competing reasonable inferences is not the task at stage two of the burden-shifting framework, but rather at stage three. As we have already said,

the stage two burden is not one of persuasion, simply production.[11]

Conclusion.  Because the union failed to meet its burden to prove an adverse employment action, we reverse the decision of CERB.

So ordered.

---

[11] Because CERB concluded that the city had failed to meet its stage two burden of production, CERB did not reach the stage three analysis.  It did, however, summarily state that were it to reach stage three, it would decide it in favor of Babcock. We need say nothing more about this aspect of CERB's decision than that it does not satisfy the standard for reviewing findings and credibility determinations of the hearing officer, who was the trier of fact.  See note 7, supra.